Notice: This opinion is subject to formal revision before publication in the
Federal Reporter or U.S.App.D.C. Reports.  Users are requested to notify the
Clerk of any formal errors in order that corrections may be made before the
bound volumes go to press.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 25, 2006      Decided December 8, 2006

No. 05-3122

UNITED STATES OF AMERICA,
APPELLEE

v.

BERNARD GURR,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 99cr00394-01)

———

*Joseph R. Conte*, appointed by the court, argued the cause
and filed the briefs for appellant.

*John P. Gidez*, Assistant U.S. Attorney, argued the cause
for appellee.  With him on the brief were *Kenneth L. Wainstein*,
U.S. Attorney at the time the brief was filed, and *Roy W.
McLeese III* and *Elizabeth Trosman*, Assistant U.S. Attorneys.

Before: SENTELLE, ROGERS and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*:  Appellant Bernard Gurr appeals his conviction by a jury of defrauding the United States when he was the manager of a federal credit union in American Samoa. He contends that the district court erred in (1) denying his motion to suppress documents discovered during a border search upon his arrival at the Honolulu International Airport; (2) admitting, over his hearsay objection, a report by an examiner from the National Credit Union Administration ("NCUA"); and (3) denying his motion for judgment of acquittal of embezzlement (Count 18) and witness tampering (Count 20). Gurr *pro se* also contends that the district court lacked subject matter jurisdiction and that venue was improper.  We affirm.

**I.**

From June 1986 until October 1993, Bernard Gurr was the manager of the American Samoa Government Employees Federal Credit Union, located in American Samoa and supervised and insured by the NCUA.  In late 1992, Pete Steiger, a Problem Case Officer at the NCUA, was assigned to review problems that had been identified at the credit union, including inadequate liquidity, poor loan underwriting, and a high loan-deficiency rating.  Steiger's investigation and audit of the credit union, which was summarized in a report consisting of an Order of Conservatorship and Confidential Statement of Grounds for Conservatorship, led the NCUA to place the credit union in conservatorship in October 1993.  In December 1999, Gurr was indicted with three other credit union employees for conspiring to defraud the United States.  The indictment alleged that the goals of the conspiracy were to keep the NCUA from discovering the true financial status of the credit union and to maintain control of the credit union's assets for the personal benefit of the conspirators.

Flying from American Samoa on December 11, 1999, Gurr was arrested for credit union fraud upon landing in Hawaii at the Honolulu International Airport. Shortly after his arrival, two United States Customs officials seized and searched his luggage and discovered financial documents taken from the credit union. On May 30, 2000, Gurr was charged in a superseding indictment with conspiracy, in violation of 18 U.S.C. § 371 (Count 1); two counts of knowingly making and causing to be made false federal credit institution entries, and aiding and abetting, in violation of 18 U.S.C. §§ 1006, 2 (Counts 2 and 3); fourteen counts of willfully and knowingly defrauding lending, credit, and insurance institutions, and aiding and abetting, in violation of 18 U.S.C. §§ 657, 2 (Counts 4, 6-18); knowingly making and causing to be made false statements in a loan and credit application, and aiding and abetting, in violation of 18 U.S.C. §§ 1014, 2 (Count 5); obstruction of an examination of a financial institution, and aiding and abetting, in violation of 18 U.S.C. §§ 1517, 2 (Count 19); and tampering with a witness, and aiding and abetting, in violation of 18 U.S.C. §§ 1512, 2 (Count 20).

The district court denied Gurr's motion to suppress the financial documents seized during Customs officials' search of his luggage and his motion to reconsider. The district court also overruled Gurr's objections to the admission of the NCUA report prepared by Problem Case Officer Steiger as hearsay, ruling that the report was admissible as a business record under FED. R. EVID. 803(6). The district court granted the government's mid-trial motion to dismiss one count of fraud (Count 7). A jury found Gurr guilty of the remaining counts. On November 14, 2003, the district court sentenced Gurr to 70 months' imprisonment to be followed by three years' supervised release.

4

**II.**

Challenging the denial of his motion to suppress the financial documents that U.S. Customs officials seized during a search of his luggage upon his arrival in the United States, Gurr contends that even if Customs officials generally have the legal authority to perform routine border searches of passengers' luggage, in this case, the warrantless search was unreasonable. The U.S. Customs Service is authorized, pursuant to 19 U.S.C. § 1582,[1] to subject every international traveler to a routine warrantless inspection. *See United States v. Galloway*, 316 F.3d 624, 629 (6th Cir. 2003); *Bradley v. United States*, 299 F.3d 197, 202 (3rd Cir. 2002); *United States v. Yang*, 286 F.3d 940, 944 (7th Cir. 2002); *United States v. Fortna*, 796 F.2d 724,

---

[1] Section 1582 authorizes the Secretary of the Treasury to issue regulations "for the search of persons and baggage . . . coming into the United States from foreign countries."  19 U.S.C. § 1582. Pursuant to that authority, the Secretary's regulations provide, in relevant part:

> All persons, baggage, and merchandise arriving in the Customs territory of the United States from places outside thereof are liable to inspection and search by a Customs officer . . . authorized to cause inspection, examination, and search to be made under section 467, Tariff Act of 1930, as amended (19 U.S.C. § 1467), of persons, baggage, or merchandise, even though such persons, baggage, or merchandise were inspected, examined, [or] searched . . . at another . . . place in the United States or the Virgin Islands, if such action is deemed necessary or appropriate.

19 C.F.R. § 162.6.  "Customs territory of the United States . . . includes the States, the District of Columbia, and the Commonwealth of Puerto Rico."  *Id*. § 134.1(f); *see also id.* § 7.2.

738 (5th Cir. 1986); 19 C.F.R. § 162.6 (2006). Gurr does not deny this, but instead maintains that the FBI's involvement transformed the inspection from a permissible border action into "an FBI fishing expedition." Appellant's Br. at 11. As proof of the FBI's dominating influence, Gurr points to evidence that the FBI agents were on site and that Customs officials asked the FBI agents whether they should keep the financial documents and, upon seizing them, immediately handed the documents over to the FBI. As Gurr sees it, Customs had no suspicion that his luggage contained contraband or dutiable merchandise,[2] and hence the search was capricious and illegal. Our review of the denial of a motion to suppress is *de novo. See United States v. Ornelas*, 517 U.S. 690, 691 (1996).

Congress enjoys a plenary "power to protect the Nation by stopping and examining persons entering this country [and, accordingly], the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). "[N]ot only is the expectation of privacy less at the border than in the interior . . . , the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border." *Id.* at 539-40. "[S]earches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping

---

[2] Under 19 U.S.C. § 482, a Customs officer is authorized

> to search any trunk or envelope, wherever found, in which [the officer] . . . may have a reasonable cause to suspect there is merchandise which was imported contrary to law; and if any such officer . . . shall find any merchandise . . . he shall seize and secure the same for trial.

and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." *United States v. Ramsey*, 431 U.S. 601, 616 (1977). The search of a passenger's luggage upon arriving in the United States after a nonstop flight from outside the country is considered "the functional equivalent of a border search." *Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973).

Courts have routinely rejected the notion that cooperation among federal agencies renders a border search unlawful. For example, then-Judge Anthony Kennedy, writing in *United States v. Schoor*, 597 F.2d 1303, 1306 (9th Cir. 1979), confronted similar circumstances as here and rejected the argument that a search violated the Fourth Amendment because it was not limited to a search for contraband and was conducted at the behest of Drug Enforcement Administration ("DEA") agents who lacked probable cause to search. In *Schoor*, DEA agents alerted Customs officials that two passengers suspected of smuggling heroin in transistor radio shipments were en route to the United States on a flight from Thailand and requested that Customs search them, as they might be carrying narcotics. A subsequent search by Customs, in the presence of a DEA agent, revealed bills for radios and other items transported earlier from Thailand, as well as airway bills apparently relating to a shipment of heroin-filled radios seized in Thailand. The two men were arrested by DEA agents for conspiracy to smuggle heroin into the United States, and the DEA agents seized the documents incident to the arrest. Judge Kennedy explained the court's reasoning:

> [T]here is no dispute that the search was conducted at an international border by customs officers legally entitled to search persons entering the United States. That the search was made at the request of the DEA officers does not detract from its legitimacy.

> Suspicion of customs officials is alone sufficient justification for a border search. The source of that suspicion is irrelevant in sustaining the search.
>
> Moreover, the border search was legitimate in scope. We recognize that the primary purpose of a border search is to seize contraband property unlawfully imported or brought into the United States. However, where customs officers are authorized to search for material subject to duty or otherwise introduced illegally into the United States and they discover the instrumentalities or evidence of crimes, they may seize the same.

*Id*. (citations omitted). The decisions in the other circuits are to the same effect. *See United States v. Boumelhem*, 339 F.3d 414, 423 (6th Cir. 2003); *People v. Villacrusis*, 992 F.2d 886, 887 (9th Cir. 1993); *United States v. Carter*, 592 F.2d 402, 406 (7th Cir. 1979); *United States v. Bates*, 526 F.2d 966, 967 (5th Cir. 1976).

Gurr thus misstates the law in arguing that no case suggests that Customs officials may seize something that they do not know to be contraband. The distinction that Gurr would draw between contraband and documentary evidence of a crime is without legal basis. *Cf. Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 301 (1967). Following Gurr's reasoning, and contrary to *Schoor*, 597 F.2d at 1306, Customs officials could not lawfully seize records of a drug operation during a border search even if Customs had been informed by the DEA that an arrested co-conspirator had implicated the passenger. The Supreme Court has suggested in analogous circumstances that the important factor for a court to consider is whether the search was conducted under proper authority, not the "underlying intent or motivation of the officers involved." *Scott v. United*

*States*, 436 U.S. 128, 138 (1978); *see United States v. Robinson*, 414 U.S. 218, 236 (1973); *see also Boumelhem*, 339 F.3d at 423; *Bates*, 526 F.2d at 967; *cf. United States v. Villamonte-Marquez*, 462 U.S. 579, 584 n.3 (1983); 1 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 1.8(b), at 261-62 (4th ed. 2004).

Additionally, Gurr misstates the trial record in asserting that Customs officials "had no idea of the significance of the documents they were looking at" because the documents consisted only of "plain old account numbers with monetary amounts next to them." Appellant's Br. at 13. Customs officials testified that they knew that the charges pending against Gurr involved a fraud allegedly committed against a federal credit union in American Samoa. The two Customs officials conducting the luggage search had been personally involved in placing Gurr under arrest. U.S. Customs Special Agent Douglas S. Palmer testified that, as a result, their suspicions were heightened, giving them every reason to search Gurr's luggage and notice the financial documents, and that it was a Customs agent who first realized the significance of the financial documents. That agent, Ferdinand Jose, a senior Customs inspector, testified that the FBI agents did not see any of the documents as he took them out of the suitcase and that it was only after he determined their relevance, reported his findings, and turned over the documents to Palmer that it was determined to retain them. Moreover, the documents seized from Gurr's luggage were clearly identifiable as relevant. For example, one of the documents is labeled at the top, "ASG EMPLOYEES FEDERAL CREDIT UNION WITHDRAWAL VOUCHER," and shows a transaction for $5000 cash; another is labeled "JOURNAL VOUCHER: American Samoa Government Employees Federal Credit Union" and shows a transaction for $1000 cash.

For these reasons, it is apparent that the Customs officials conducted a permissible border search and lawfully seized the documents. The district court's finding that there was "some evidence" of FBI involvement in the search, as a result of an FBI request to Customs to retain the financial documents, does not require a different conclusion and we need not address the government's argument based on inevitable discovery, *see Nix v. Williams*, 467 U.S. 431 (1984), and its progeny, upon which the district court relied. *See United States v. Davis*, 181 F.3d 147, 149 (D.C. Cir. 1999).

Moreover, even if we had doubt about the lawfulness of Customs' seizure of Gurr's luggage and assumed, as Gurr maintains, that the superseding indictment sprang from the seizure of the documents found therein, Gurr fails to explain how the financial documents seized at the Honolulu airport affected his convictions on any of the counts in the indictment. On appeal, the government explains that most of the documentary evidence critical to its case was obtained during the course of the NCUA investigation, either from the credit union or the NCUA Texas storage facility, independent of the Honolulu documents. Further, witnesses testified regarding the same information as appeared in the Honolulu documents. For example, as to the Honolulu documents relevant to Counts 6 through 12 involving Gurr's defrauding of Faataumalama Felti, Felti testified that Gurr had told him to sign a receipt for money from his credit union account that he never received. This testimony was bolstered by the introduction of credit union records regarding the suspect transactions. Additional counts that Gurr identifies in his reply brief as having been proved by the Honolulu documents are similarly supported by other record evidence. Hence, any error in admitting the seized financial documents was harmless beyond a reasonable doubt and a new trial is not required. *See Chapman v. California*, 386 U.S. 18, 24 (1967).

### III.

Gurr also contends that the district court erred in overruling his hearsay objection to the admission of Exhibit PS 41, the NCUA Order of Conservatorship and Confidential Statement of Grounds for Conservatorship ("the report"). Because the report, which was hearsay, was based, in part, on the NCUA Problem Case Officer's interviews of credit union employees, Gurr maintains that it contained compound hearsay statements by his accusers. From this he concludes that the report was testimonial and its admission violated his rights under the Confrontation Clause, citing *Crawford v. Washington*, 541 U.S. 36 (2004), and *Davis v. Washington*, 126 S. Ct. 2266 (2006). Specifically, Gurr maintains that the report was "testimonial" because in *Davis*, the Supreme Court concluded that a domestic battery victim's written statements in an affidavit given to the police at a crime scene were "testimonial" and therefore subject to the Confrontation Clause.

In addressing Gurr's hearsay objection, the district court noted that the report appeared to meet the requirements of a business record under FED. R. EVID. 803(6) and that because the preparer of the report was testifying and would be subject to cross-examination, the only remaining question was whether the report contained references to statements by witnesses who would not be testifying at trial. In this regard, the district court observed that page 5 of the Confidential Statement of Grounds for Conservatorship included statements that "information was received from an employee" regarding one of the credit union family accounts and that two former employees had "made allegations . . . about improprieties on the part of current management" that had not been confirmed. The district court initially ruled that the report was inadmissible because of the prejudicial statements by witnesses who were unavailable for the defense to cross-examine. The prosecutor subsequently

advised the district court that the sources of the double hearsay would be testifying at trial. The district court then ruled that the report was admissible, noting that the statement concerning the allegations by two former employees was in the nature of minutes, and that upon applying FED. R. EVID. 403, the probative value of the report outweighed any prejudice to Gurr. The district court further indicated that it would redact the compound hearsay statements that appear on page 5 of the report. Our review of the district court's admission of the report is for abuse of discretion. *See United States v. Kim*, 595 F.2d 755, 763 n.38 (D.C. Cir. 1979).

To the extent that the report was a statement "other than one made by the declarant while testifying at the trial . . . offered in evidence to prove the truth of the matter asserted," FED. R. EVID. 801(c), it was hearsay, and to be admissible it must fall within one of the exceptions to the hearsay rule, *see* FED. R. EVID. 802. The business records exception to the hearsay rule provides for the admission of:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the information or method or circumstances of preparation indicate lack of trustworthiness.

FED. R. EVID. 803(6). The hearsay in records of regularly conducted activity is admissible "only if it was reported to the maker [of the report] directly or through others, by one who is

himself acting in the regular course of business, and who has personal knowledge." *United States v. Smith*, 521 F.2d 957, 964 (D.C. Cir. 1975).

"Double hearsay exists when a business record is prepared by one employee from information supplied by another employee." *United States v. Baker*, 693 F.2d 183, 188 (D.C. Cir. 1982); *see* FED. R. EVID. 805. It is excepted from the hearsay rule provided "both the source and the recorder of the information, as well as every other participant in the chain producing the record, are acting in the regular course of business," *Baker*, 693 F.2d at 188. Because the regularity of making the record is evidence of its accuracy, statements by "outsiders" are not admissible for their truth under FED. R. EVID. 803(6), *see Baker*, 693 F.2d at 188 (citing *United States v. Davis*, 571 F.2d 1354 (5th Cir. 1978); 4 DAVID W. LOUISELL & CHRISTOPHER B. MUELLER, FEDERAL EVIDENCE, § 448 (1980); MCCORMICK ON EVIDENCE § 310, at 725-26 (2d ed. 1972); 4 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S EVIDENCE ¶ 803(6)[04] (1981)), in the absence of a showing that the outsider had a duty to report the information, *see United States v. Bortnovsky*, 879 F.2d 30, 34 (2d Cir. 1989), or that it was standard practice for the preparer to verify information from outside sources, *see United States v. Patrick*, 959 F.2d 991, 1001 (D.C. Cir. 1992).

On appeal, Gurr does not challenge the district court's factual findings that, as Steiger, the preparer of the report, testified, it was the regular practice of the NCUA to create these reports in order to place credit unions into conservatorship, and that it was a normal part of his job to prepare the Confidential Statement of Grounds for Conservatorship, which he did in this

case.[3] Gurr offers nothing to suggest a lack of trustworthiness as to Steiger's recording of his opinions, diagnoses, and observations. *See United States v. Frazier*, 53 F.3d 1105, 1109-10 (10th Cir. 1995) (citing 4 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 450, at 534-36 (2d ed. 1994)); *cf. United States v. Garland*, 991 F.2d 328, 334-35 (6th Cir. 1993). Instead, Gurr contends that the district court erred in admitting the report for three reasons.

First, Gurr maintains that the report was hearsay admitted in violation of FED. R. EVID. 802. However, most of the report appears to be admissible as Steiger's course-of-business observations under the exception of FED. R. EVID. 803(6). Gurr has not pointed to anything in the record suggesting otherwise.

Second, Gurr maintains that specific statements within the report were inadmissible double hearsay. Of the five potentially problematic paragraphs on page 5 of the report, Gurr points to only two of them in his brief. Those paragraphs state that "a

---

[3] Gurr's claim that the report was made in contemplation of litigation and therefore was inadmissible under FED. R. EVID. 803(6), *see Palmer v. Hoffman*, 318 U.S. 109, 113-14 (1943); *Scheerer v. Hardee's Food Systems, Inc.*, 92 F.3d 702, 706-07 (8th Cir. 1996), is raised for the first time on appeal and he cannot show plain error, *see United States v. Thomas*, 896 F.2d 589, 591 (D.C. Cir. 1990). The credit union was in fact placed in conservatorship and the preparer of the substantive part of the report, i.e., the Confidential Statement of Grounds for Conservatorship, testified at trial. Gurr's further claim that factual findings in public reports under FED. R. EVID. 803(8)(C) are admissible only against the government in criminal cases appears only in his reply brief and is therefore waived, *see United States v. Taylor*, 339 F.3d 973, 977 (D.C. Cir. 2003); in any event, any error was harmless because the preparer of the report and the persons upon whom he relied testified and were subject to cross-examination at trial. *See United States v. Davis*, 181 F.3d 147, 149-50 (D.C. Cir. 1999).

former employee provided information demonstrating that the manager's list of his immediate family members' accounts was incomplete" and that "information was received from an employee indicating another family account." However, Gurr's counsel published them to the jury, explaining on appeal that he did so in order to impeach the integrity of the report. Two other paragraphs on page 5 include similar statements. One paragraph states that "[f]our former employees and two former directors have allegedly committed fraud." Again, Gurr's counsel published this paragraph during his cross-examination of Steiger. Gurr may not now object to evidence that he himself submitted at trial. The other paragraph states that "two former employees . . . made allegations . . . about improprieties on the part of the current management" that could not be verified. The district court ruled that this paragraph was admissible only as minutes of Steiger's investigation, and not to prove the truth of the allegations against Gurr; hence, it poses no hearsay problem. *See* FED. R. EVID. 801. The double hearsay in the remaining paragraph was an employee's statement that she had been told by a credit union board member "to stand behind current management or look for a new job." Admission of this statement, as well as the other double hearsay, was harmless error because the witnesses testified at the trial and were subject to cross-examination. *See* FED. R. CRIM. P. 52(a); *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

Third, Gurr maintains that the admission of the double hearsay violated his rights under the Confrontation Clause, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. Because Gurr published some of the double hearsay to the jury and because Steiger, employees (including former employees), and account holders testified at trial and were subject to cross-examination, Gurr's Confrontation Clause contention fails. *See United States v.*

*Powell*, 334 F.3d 42, 45-46 (D.C. Cir. 2003). Even if we were to assume that there had been such a violation, any error in admitting the report was harmless. *See Chapman*, 386 U.S. at 22-23; *Baker*, 693 F.2d at 189; FED. R. CRIM. P. 52(a). The NCUA examiners were available for cross-examination and they testified regarding the reasons for their conclusions that conservatorship was necessary. There was abundant evidence, including documentary evidence, independent of the report relating to the matters it discussed. Defrauded credit union account holders as well as present and former credit union employees testified and were available for cross-examination. A comparison of the report and the trial record reveals that the government's witnesses testified regarding its key areas of discussion: insolvency, unprofitability, increasing delinquency, non-amortizing loans, liquidity/asset liability management, weak management, and fraud/internal controls.

## IV.

Gurr also challenges the sufficiency of the evidence of embezzlement in Count 18[4] and corrupt persuasion of a witness

---

[4] Section 657 provides that it is a criminal offense for any person who

> being an officer, agent or employee of or connected in any capacity with [an insured credit institution,] . . . embezzles, abstracts, purloins or willfully misapplies . . . [funds of that institution] . . . or [funds] pledged or otherwise entrusted to its care.

18 U.S.C. § 657.

in Count 20.[5]

Viewing the evidence most favorably to the government, as we must, *see United States v. Wahl*, 290 F.3d 370, 375 (D.C. Cir. 2002), there was sufficient evidence that Gurr embezzled money from credit union member Francis Stowers. Embezzlement is "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *United States v. Holmes*, 611 F.2d 329, 331 (10th Cir. 1979) (quoting *Moore v. United States*, 160 U.S. 268, 269 (1895)). The evidence showed that Stowers, at Gurr's direction, signed a blank voucher; that Gurr told Stowers to return to the credit union the following day to collect his money; that Gurr gave the voucher to the credit union teller and told her to withdraw $5,000 from Stowers' account, which she did, giving the money to Gurr; and that Stowers returned the next day but never received his money. The jury could have reasonably concluded that Gurr embezzled or misapplied credit union funds when he (1) instructed a teller to withdraw the cash meant as a home improvement loan for Stowers; (2) took the money from the teller; and (3) never gave

---

[5] Section 1512(b) provides that it is a criminal offense to

> corruptly persuade[] another person, or attempt[] to do so, or engage[] in misleading conduct toward another person, with intent to . . . influence, delay, or prevent the testimony of any person in an official proceeding . . . [or] hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a federal offense.

18 U.S.C. § 1512(b).

the money to Stowers.  As the government maintains, a fair inference can be drawn that Gurr fraudulently converted property entrusted to him and used it for his own purposes.

Similarly, there was sufficient evidence of witness tampering.  The evidence showed that after Gurr was arrested, he and another credit union employee (Fiapapalagi Eteuati) attempted to corruptly persuade a witness (Grace Uigalelei) to sign an affidavit falsely stating that she had authorized money to be transferred from her account.  Gurr contends that this is insufficient to establish the allegation in the indictment because there was no evidence of cooperation between Gurr and the other credit union employee and no evidence that the witness was intimidated or threatened.  However, Gurr was not charged with intimidating or threatening Uigalelei, and the jury could reasonably find that Gurr, with the assistance of Eteuati, attempted to "corruptly persuade[]" Uigalelei in order to influence her testimony by having her sign a false affidavit. *See, e.g., United States v. Sanders*, 421 F.3d 1044, 1051 (9th Cir. 2005); *United States v. LaShay*, 417 F.3d 715, 718 (7th Cir. 2005); *United States v. Cruzado-Laureano*, 404 F.3d 479, 487 (1st Cir. 2005); *United States v. LaFontaine*, 210 F.3d 125, 132-33 (2d Cir. 2000).

**V**.

Finally, Gurr contends that the district court lacked jurisdiction and that venue was improper.  He first raised these defenses nearly two years after his conviction (but before sentencing).

Gurr's objection is that only the courts of American Samoa had jurisdiction because that is where the crimes occurred.  *See* U.S. CONST. art. III, § 2, cl. 3; 28 U.S.C. §§ 81-144; FED. R. CRIM. P. 18.  Contrary to Gurr's contentions, U.S. Code Title 18

applies in American Samoa regardless of whether the Secretary of the Department of the Interior has said so explicitly, *see* 18 U.S.C. § 5, and American Samoan courts do not have jurisdiction of violations of Title 18, *see id.* § 3231. Rather, the district courts of the United States have exclusive, original jurisdiction of all offenses against the laws of the United States. *See id.*

Gurr's objection to venue is also meritless. Although Gurr last resided in American Samoa and was arrested in Hawaii after voluntarily entering the United States, because he was not arrested or "first brought" into the United States until after he had been indicted in the District of Columbia, venue was proper in the District of Columbia. *See* 18 U.S.C. § 3238[6]; *United States v. Catino*, 735 F.2d 718, 724 (2d Cir. 1984); *United States v. Hsin-Yung*, 97 F. Supp. 2d 24, 28 (D.D.C. 2000); 2 CHARLES ALAN WRIGHT, FEDERAL PRACTICE & PROCEDURE § 304 (3d ed. 2000) (citing *United States v. Hilger*, 867 F.2d 566, 568 (9th Cir. 1989); *United States v. Layton*, 855 F.2d 1388,

---

[6] Section 3238 provides:

> The trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought; but if such offender or offenders are not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender or of any one or two or more joint offenders, or if no such residence is known the indictment or information may be filed in the District of Columbia.

18 U.S.C. § 3238.

1410-11 (9th Cir. 1988), *overruled by Guam v. Ignacio*, 10 F.3d 608, 612 n.2 (9th Cir. 1993)).

Accordingly, we affirm the judgment of conviction.