In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1319

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHRISTOPHER A. BUDD,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 4:07-cr-40026-JBM-JAG-1—**Joe Billy McDade**, *Judge.*

ARGUED SEPTEMBER 23, 2008—DECIDED DECEMBER 17, 2008

Before BAUER, CUDAHY and WILLIAMS, *Circuit Judges.*

BAUER, *Circuit Judge.* Christopher Budd was charged in four counts with receipt, possession, and distribution of child pornography. After the district court denied Budd's motion to suppress evidence found on his computer and certain statements he made to the police, Budd entered a conditional guilty plea to all four counts while reserving his right to appeal the court's ruling on the motion. Budd now appeals that ruling and we affirm.

## I.  BACKGROUND

Budd left his Gateway computer with CNT Computers, Inc. (CNT) for repairs on December 13, 2006. While diagnosing one of the computer's problems, Tom Doyle, the owner of CNT, discovered a file titled, "A Three Year Old Being Raped." Doyle opened the file and saw a video of a small female child naked in a bathtub with a naked adult male who had an erect penis. Doyle exited the video before he saw any physical contact between the two.

On December 14, 2006, Doyle called the Moline Police Department to report what he had seen. Officer Mark Kinsey came to CNT, spoke with Doyle, and, with Doyle's permission, took the computer to the Moline Police Department where it was logged into evidence. The case was assigned to Detective Ted Teshak for further investigation. Detective Teshak began his investigation on December 15, 2006, by opening a case file and running a criminal history and driver's license check on Budd. Because of a combination of a general backlog of cases, filling in for his colleagues during the holiday season, taking days off for the holiday season, and moving into a new police station, no work was done on the case between December 15, 2006 and January 11, 2007.

Amy Hillyer, a CNT employee, called Detective Teshak on January 11, 2007 and reported that Budd had been calling and visiting the store inquiring about his computer. Hillyer had told Budd that the computer was not ready

yet.[1] Detective Teshak attempted to contact Doyle over the next two business days to confirm Doyle's report before moving forward with the investigation. Before Detective Teshak could reach Doyle, Budd called the Moline Police Department on January 15, 2007 and reported the suspected theft of his computer by CNT. Budd was transferred to Detective Teshak who told Budd that the police department had his computer and that there had been a complaint about possible child pornography on the computer. Budd volunteered that the computer contained "pretty graphic" files that he should not have. Detective Teshak said that he needed to talk to Budd in person and Budd agreed to come to the police station in a few hours after he explained that he had the files on his computer because he was a "vigilante" who searched for online predators. After speaking with Budd on the phone, Detective Teshak was able to reach Doyle who confirmed the events he had related to Officer Kinsey.

Budd arrived at the police station as planned and was escorted to an interview room. He was interviewed by Detective Teshak in the presence of his supervisor, Sergeant Titus. After being told—and confirming that he understood—that the interview was voluntary, Budd admitted that he had been collecting child pornography on his computer for the last two months in his efforts as a "vigilante" and that there were about 30 files of child

---

[1] Hillyer was not instructed to do this by anyone in the Moline Police Department.

pornography on his Gateway computer.[2] During the interview, Budd denied having any child pornography other than that on the Gateway computer and verbally consented to a search of his apartment. The three men drove to Budd's apartment and, once inside, Budd signed a consent-to-search form. Detective Teshak's search revealed a Seagate hard drive along with some CDs and floppy diskettes. Budd allowed the officers to take the items for the purpose of searching them and agreed to accompany the officers back to the station. Upon returning to the same interview room, Budd signed a consent-to-search form for the hard drive, CDs, and floppy diskettes.

After being reminded that he was free to leave at any time, Budd agreed to answer some more questions and stated that he began downloading child pornography as a vigilante, but that he found it both arousing and disturbing at the same time.

The next day, January 16, 2007, Budd called Detective Teshak to clarify some of the statements Budd made the previous day. Budd volunteered that he had been addicted to child pornography for a few years and that there would likely be more child pornography on the Seagate hard drive. During the phone call, Budd agreed to come to the police station the following day for more questioning. After being told again at the police station that the interview was voluntary and that he did not have to answer any questions with which he felt uncom-

---

[2] Budd later stated that he downloaded the files over a seven-month period.

fortable, Budd gave a more detailed account of his history of downloading child pornography onto his computer.

A search warrant was obtained on January 30, 2007 for the Gateway computer and Seagate hard drive and an examination of these two devices revealed at least 30 still images and at least 70 videos of child pornography. Budd was arrested on March 12, 2007. Before trial, Budd moved to suppress both the incriminating statements he made to the police and the evidence found on his computer and hard drive. The district court denied the motion and Budd pleaded guilty, but specifically retained his right to appeal the ruling on his motion to suppress.

## II.  DISCUSSION

On appeal, Budd claims that the district court erred in denying his motion to suppress. Budd argues that his Gateway computer was illegally seized, therefore the exclusionary rule precludes introduction of the images found on his computer. Budd contends that his statements to the police and the evidence found on his Seagate hard drive were derivative of the illegal seizure of his computer and should have been suppressed as fruits of the poisonous tree. He also asserts that the district court should have suppressed his statements to the police because they were given without proper *Miranda* warnings. The government states that the evidence was admissible because the seizure of the Gateway computer was reasonable and that the computer was searched pursuant to a valid search warrant.

The government also contends that assuming the seizure was illegal, the evidence at issue was obtained independent of any illegality and was therefore admissible. Finally, the government argues that Budd's statements were voluntary and that *Miranda* warnings were not required because Budd was not in custody when he made the statements at issue.

## A. Budd's Statements to the Police

Budd claims that his Fourth Amendment right to be free from unreasonable seizures was violated: (1) immediately upon Officer Kinsey taking possession of the Gateway computer; and (2) independently due to the length of time the Moline Police Department retained the computer before seeking a search warrant. We assume, without deciding, that at some point during the 48-day period after Officer Kinsey obtained the computer and before the police obtained a search warrant, the seizure became unreasonable due primarily to the length of the delay.

Budd argues that, but for the illegal seizure and continued detention of his computer, he would have had no reason to call the police, would not have agreed to questioning, and would not have made any incriminating statements to the authorities; therefore his statements should have been suppressed as derivative of the illegal seizure. The government argues that Budd voluntarily made the incriminating statements and that they were not derivative of any illegality.

"[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804 (1984) (citations omitted). However, "[t]he [Supreme] Court has never held that evidence is 'fruit of the poisonous tree' simply because 'it would not have come to light but for the illegal actions of the police.'" *Id.* at 815 (quoting *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)). "Even in situations where the exclusionary rule is plainly applicable, we have declined to adopt a '*per se* or "but for" rule' that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with [illegal police activity]." *United States v. Ceccolini*, 435 U.S. 268, 276 (1978) (citation omitted). The true question is "whether, granting the establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *United States v. Carsello*, 578 F.2d 199, 202 (7th Cir. 1978) (quoting *Wong Sun*, 371 U.S. at 488).

In this case, Budd demonstrated nothing more than but for causation. There is no evidence that the government exploited the illegal seizure of the computer; the government did nothing more than place the unsearched computer into an evidence room and leave it there. It was Budd who called the police, volunteered that he had "pretty graphic" files on his computer, and agreed to come down for questioning at the police station. It was Budd

who called Detective Teshak the day after Budd's first interview to clarify some of his previous statements. Budd chose to make this second phone call, not because of police exploitation of the illegal seizure, but, as he told Detective Teshak, because he felt that in order to start the "healing" process, he needed to be truthful about the files on his computer. The illegal seizure indirectly prompted Budd's first phone call to the Moline Police Department; however, the seizure was not exploited, nor did it compel Budd to incriminate himself. Budd's statements to the police were not derivative of the seizure.

Budd also argues that his statements should have been suppressed because they were not preceded by proper *Miranda* warnings. The government responds that since Budd was not in custody when he made the relevant disclosures, *Miranda* warnings were not required.

> *Miranda* warnings are not required merely because the individual questioned by law enforcement officers is a suspect or is the focus of a criminal investigation. The suspect must be both "in custody" and subjected to "interrogation" before the *Miranda* warning[s] are required to be administered.

> A custodial interrogation occurs when there is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

*United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2006) (internal quotations and citations omitted). "[T]he test is not whether the defendant was under a subjective

belief that his or her movements were restricted, but whether a reasonable person in the defendant's position would believe that he or she was free to leave." *United States v. Lennick*, 917 F.2d 974, 977 (7th Cir. 1990) (citation omitted).

> A totality of the circumstances test is used to [make this determination]. In considering the totality of the circumstances, factors include (1) whether the encounter occurred in a public place; (2) whether the suspect consented to speak with the officers; (3) whether the officers informed the individual that he was not under arrest and was free to leave; (4) whether the individuals were moved to another area; (5) whether there was a threatening presence of several officers and a display of weapons or physical force; (6) whether the officers deprived the defendant of documents she needed to continue on her way; and (7) whether the officers' tone of voice was such that their requests would likely be obeyed.

*Barker*, 467 F.3d at 628-29 (internal quotations and citations omitted).

Budd initiated his first contact with the Moline Police Department and agreed to meet at the police station for questioning. After Detective Teshak obtained some background information from Budd, Budd was told that the interview was voluntary, that he could leave at any time, and that he was not going to be arrested on that date. With this knowledge, Budd agreed to talk with Detective Teshak. When he rode with Detective Teshak and Sergeant Titus to his apartment, Budd rode in the front seat

of an unmarked Ford Taurus. Budd agreed to return to the police station for more questioning after his apartment was searched. Before this second interview, Budd was reminded again that the interview was voluntary and was told that he did not have to answer any questions he was not comfortable answering. When Budd called Detective Teshak the next day, Budd again agreed to meet at the police station. Budd allowed Detective Teshak to pick him up from the community college he was attending and to drop him off at his apartment after the interview. Again, Budd rode in the front seat of the vehicle. Before asking any questions on January 17, 2007, Detective Teshak told Budd that the interview was voluntary and that he did not have to answer any of the questions.

Each interview took place in what Detective Teshak described as a "soft" interview room on the second floor that had carpet, wallpaper, and comfortable furniture, and was used to interview victims, witnesses, and suspects. At the suppression hearing, Budd agreed that neither officer raised his voice during the January 15, 2007 interviews, that the tone of those interviews was "very calm," and that "the whole interaction during the entire day was fairly calm." The officers were dressed in plain clothes and, though carrying sidearms, never made a display of force. Budd was never placed in handcuffs before he was formally arrested and read his *Miranda* rights.

The majority of Budd's support for his contention that he was in custody focuses around the fact that he was in

a police station and could not roam the halls of the investi-gations unit unescorted. Budd explains how he had to push a buzzer to be let into the main lobby of the police station. He was escorted to the second floor by way of an elevator that required a magnetic security card to operate. He walked down a long hallway to get to the interview room. He understood that he was not allowed to move throughout the building without one of the officers with him.[3] These are not extraordinary circum-stances, especially in light of the fact that Budd agreed to meet at the police station.

Budd's only other complaint is that toward the end of the first interview he requested to go to the bathroom and claims he was told: "in just a minute." Sergeant Titus did not remember Budd being asked to wait. Regardless, this did not "deprive[ ] [Budd] of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Budd was escorted to a secure bathroom where the occupant could not open the door or flush the toilet from the inside. This was the closest bathroom to the interview room and was commonly used by all inter-viewees in that part of the building, including witnesses. Sergeant Titus explained the security features to Budd before he used the bathroom and stood outside the door to let Budd out upon request. Based on the totality of the circumstances, a reasonable person in Budd's position

---

[3] Sergeant Titus testified that all non-staff persons, including officers from other jurisdictions, were required to be escorted in and out of the secured part of the building.

would have believed he or she was free to leave. Therefore, Budd was not in custody and *Miranda* warnings were not required.

### B. Seagate Hard Drive

Budd contends that the discovery of the Seagate hard drive was derivative of the initial illegal seizure of his Gateway computer so that the evidence on the hard drive should have been suppressed. As discussed above, Budd's statements to the police were not derivative of any illegal seizure. They were voluntarily given while Budd was not in custody. It follows then, that evidence discovered as a result of those statements cannot be tainted.

During one of his voluntary conversations with the police, Budd verbally agreed to let the officers search his apartment. Budd allowed the police into his apartment and signed a consent-to-search form. When the hard drive was discovered, Budd verbally consented to the officers taking the hard drive for the purpose of searching it. Budd later signed a separate consent-to-search form for the hard drive.

Despite giving two verbal consents and signing two consent-to-search forms, all at separate times, Budd now contends that he did not knowingly or voluntarily consent to the search of his apartment or to the search of the Seagate hard drive. We agree with the district court that Budd voluntarily consented to both searches. Both of the consent forms Budd signed stated:

> 1.  I have not been promised anything in exchange for consenting to this search.

2. I have not been threatened in any way to force or compel me to give this voluntary consent to search.

3. I have the right to refuse the search of my vehicle, person, or residence.

Detective Teshak testified that he observed Budd take the time to pause and read both consent forms. At the suppression hearing, Budd admitted that he at least skimmed the form the first time he signed it. Budd also confirmed that he was not threatened into signing the forms. Additionally, the actual search of the hard drive was not conducted until the police obtained a valid warrant, as discussed below. Because the hard drive was discovered and searched pursuant to Budd's voluntary and repeated consent, and the search was executed pursuant to a valid warrant, the district court did not err in denying Budd's motion to suppress the evidence found on the hard drive.

## C. Gateway Computer

As mentioned above, we assume, for the purpose of this review, that the seizure of Budd's computer was unreasonable. However, the legality of the seizure is not the ultimate issue in this case because an illegal seizure does not automatically preclude all evidence obtained after the seizure.

> [T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly

balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred. When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.

*Nix v. Williams*, 467 U.S. 431, 443 (1984) (citations omitted). Typically these so-called independent source doctrine cases involve an illegal search and discovery of evidence followed by a second search conducted after a warrant is obtained. *See Murray v. United States*, 487 U.S. 533, 535-36 (1988); *see also United States v. Markling*, 7 F.3d 1309, 1311-12 (7th Cir. 1993). In this case, we are faced with the presumptively illegal seizure of Budd's computer followed by a search of the computer conducted pursuant to a warrant. However, the same process can be used to determine whether the evidence discovered on Budd's computer was obtained independent of the original illegal police activity. "The ultimate question" in this case is whether the search of Budd's computer pursuant to the search warrant "was in fact a genuinely independent source of the" evidence found on his computer. *Murray*, 487 U.S. at 542.

Determining whether evidence was obtained from an independent source involves a two-part test. *Markling*, 7 F.3d at 1315. "The first question is whether the illegally obtained evidence affected the magistrate's decision to issue the search warrant." *Id.* (citing *Murray*, 487 U.S. at 542). The heart of this question is whether,

taking away any illegally obtained information, the affidavit still demonstrated probable cause. *Markling*, 7 F.3d at 1317. In this case, the only thing possibly illegally obtained was the computer itself and physical possession of the computer was not required to show probable cause. Doyle's testimony alone was sufficient to create "a fair probability that contraband or evidence of a crime [would] be found" on Budd's computer. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

The admissions by Budd, though not necessary, also created probable cause and were not tainted by the illegal seizure, as discussed above.

The second part of this test asks whether the "decision to seek the warrant was prompted by" information gained from the initial illegal activity. *Markling*, 7 F.3d at 1315-16 (quoting *Murray*, 487 U.S. at 542). Again, in this case, the only thing gained from the initial illegal activity was physical possession of the computer. The district court seemed to credit Special Federal Officer Lynn's testimony that he would have applied for a warrant regardless of whether the Moline Police Department had physical possession of the computer. While it is true that "officers' assurances" that they would have sought a warrant are not to be credited "[w]here the facts render those assurances implausible," in this case, the assurances were not implausible. *Murray*, 487 U.S. at 540 n.2. Regardless, the computer was not searched until a warrant was obtained so the only information available when deciding to apply for the warrant was Doyle's account of what he had seen and Budd's statements, both of which

were untainted and it was permissible to consider them. Simply put, the officers were not influenced by any improper information because there was no improper information by which to be influenced.[4]

### III. CONCLUSION

For the reasons set forth above, we AFFIRM the district court's denial of Budd's motion to suppress.

---

[4] Budd's argument that he might have deleted the files had the computer been promptly returned fails because it is speculative and because there is no constitutional right to destroy evidence. *Segura*, 468 U.S. at 815-16 & n.10.