John DOE, Plaintiff

v.

UNITED STATES of America and Department of Homeland Security, Defendants.

Case No. 11–20548–CIV.

United States District Court,
S.D. Florida,
Miami Division.

Sept. 26, 2012.

Scott Alan Srebnick, Miami, FL, for Plaintiff.

Vincent Albert Citro, United States Attorney's Office, Orlando, FL, for Defendants.

### ORDER

ADALBERTO JORDAN, District Judge.

This case concerns the targeted seizure of an individual's papers and files, both printed and electronic, upon the individual's entrance into the United States. The government asserts that it developed probable cause to support the issuance of a search warrant before and independent of the seizure. If that had been evidenced by a legally sufficient warrant application predating the seizure, there would be no issue at all. But it was not. Instead, the government seized the printed and electronic papers and files at the border, relying on its historic power to conduct routine border inspections to keep unauthorized individuals and contraband or untariffed goods out of the country. Had the government done this anywhere other than at the border, then this would again be an easy case because it would involve nothing more than a straightforward application of Justice Holmes' classic opinion for the Su-

preme Court in *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920) ("The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all.").

So, the case presents two questions. First, can the government seize documents that are not themselves contraband or subject to any revenue tariff at an international border without a warrant? Second, if it cannot, then should an *ex parte* affidavit written after the government conducted an illegal seizure of documents be relied upon to allow the government to obtain a warrant and now read and make use of those documents?

Following an evidentiary hearing and oral argument, and for the reasons stated below, I conclude that I need not answer the first question and that the answer to the second question is yes. Accordingly, Mr. Doe's motion for the return of his property is DENIED and his request for a protective order [D.E. 1] is DENIED AS MOOT.

## I. FACTUAL BACKGROUND

On January 30, 2011, at approximately 4:00 p.m., John Doe, a Florida licensed attorney specializing in civil and criminal law,[1] arrived at Miami International Airport on a flight from Paris, France. Mr. Doe was traveling with two pieces of luggage, one that he checked prior to departure and one that he carried on the plane with him. Mr. Doe's carry-on bag contained hard copy documents, a laptop com-

puter, a handheld Blackberry device, and a cellular phone.

Immediately upon exiting the plane, Mr. Doe was met by an agent from the Department of Homeland Security. The agent asked to see Mr. Doe's passport and customs declaration form. Mr. Doe complied with the request. The agent then instructed Mr. Doe to follow her down the airport concourse. At the end of the concourse Mr. Doe and the agent were met by three other agents from DHS. All four agents then escorted Mr. Doe to the baggage claim area. After he retrieved his checked bag from the carousel, Mr. Doe was taken to a secondary inspection area and handed a leaflet regarding DHS' border search policies. The agents then proceeded to search both bags.

The search was being directed by DHS Special Agent David Dietrich, who was in a room adjacent to the secondary inspection area. Prior to Mr. Doe's arrival at MIA, Agent Dietrich was asked, by a DHS agent in Orlando, to conduct a customs investigation and border search of Mr. Doe upon his arrival at MIA, in relation to an ongoing criminal investigation of Mr. Doe and one of his clients. Pursuant to Agent Dietrich's instructions, the DHS agents conducting the actual search seized the hard copy documents, laptop computer, Blackberry, and cellular telephone that Mr. Doe was traveling with. After being told that the seized items would be copied, Mr. Doe informed the agents that he was an attorney and that the items contained attorney/client privileged information. One agent agreed to make note of that fact, but the items were nevertheless

---

1. Mr. Doe has requested to be identified as "John Doe" in all court filings because of the potential risk of damage to his reputation [D.E. 3]. *See Plaintiff B v. Francis,* 631 F.3d 1310, 1315–16 (11th Cir.2011) ("A party may proceed anonymously in a civil suit in federal court by showing that he has a substantial privacy right which outweighs the customary and constitutionally-embedded presumption of openness in judicial proceedings.") (internal quotations omitted).

seized and brought to Agent Dietrich in the adjoining room.

Agent Dietrich looked through the printed documents and made copies of the ones that he thought might deal with export/import violations and banking records. In addition, Agent Dietrich turned over the seized electronic devices to DHS Special Agent David Castro, a computer forensics agent with the DHS, who attempted to access the laptop's hardrive at the airport. Agent Castro could not copy the contents of the laptop with the equipment at MIA, however, and decided that the devices needed to be taken offsite to the local DHS investigations office to be properly copied.

Approximately one and a half hours after seizing Mr. Doe's belongings, the agent who initially took the items returned and gave Mr. Doe back his hard copy documents. The agent informed Mr. Doe that the other items (the laptop, Blackberry, and cellular phone) could not be returned at that time because DHS was having difficulty copying the devices. The agent gave Mr. Doe a DHS detention notice and custody receipt for detained property and told Mr. Doe that the electronic devices would be available at a later date. The receipt indicated that the items were being detained for forensic examination and listed Agent Castro as the detaining agent. Mr. Doe then left the airport.

Agent Castro took the electronic devices back to his office where he copied their contents. After making the copies, he conducted a cursory examination of the images and pictures on the laptop to ensure there was no contraband—i.e., child pornography—on it. After ensuring that there was no child pornography on the computer, Agent Castro determined that the electronic devices could be returned to Mr. Doe.

On February 1, 2011, Mr. Doe contacted Agent Castro to retrieve the seized items. Agent Castro told Mr. Doe to contact DHS Special Agent Roldan Vasquez to make arrangements to retrieve the items. On February 2, 2011, Mr. Doe spoke to Agent Vazquez, who informed him that the items were ready to be picked up in Doral, Florida, approximately 10 miles away from MIA. Mr. Doe retrieved the seized items later that day, but the government retained the imaged copies of the devices.[2]

Over the following two weeks, Mr. Doe's attorney attempted unsuccessfully to secure the return of the copies and ensure that any privileged information was not being reviewed. After the government failed to provide any assurance that the privileged information was not being reviewed, on February 17, 2011, Mr. Doe filed an emergency motion for the return of property—i.e., the seized documents—pursuant to Federal Rule of Criminal Procedure 41(g) and motion for a protective order against the review of privileged materials [D.E. 1].

---

**2.** In support of his argument that the government's actions were unreasonable under the Fourth Amendment, Mr. Doe claims in part that the government damaged his computer prior to returning it. The government disputes these allegations.

On January 6, 2012, in lieu of a hearing, Mr. Doe, with the government's agreement, submitted a stipulation regarding the testimony of computer technician Arthur Lane [D.E. 32], to whom Mr. Doe took his laptop after retrieving it from the government. According to Mr. Lane, when he received the laptop the keyboard was damaged, the hard drive was missing a hold-screw and the sides of the laptop were not properly aligned. Mr. Lane admits, however, that he has no personal knowledge concerning who possessed the computer before Mr. Doe gave it to him, and, therefore, he does not know who caused the damage to the computer. Accordingly, Mr. Doe has failed to provide any persuasive evidence that the government damaged his laptop.

On February 22, 2011, I held a hearing on Mr. Doe's emergency motion. At the hearing the government made the following representations: that it maintained a copy of the contents of the seized items (the backup data) on a computer server in Miami, Florida; the copy was accessible by the government; and copies of the printed documents were sent from an agent in Miami to another agent in Orlando, Florida, via email. The following day I entered an agreed order regarding the seized items [D.E. 10]. Pursuant to that order, the government was required to deliver to the custody of the court hard copies of the emails and attachments, as well as a copy of the backup data the government maintained on its computer server. After delivering these items to the court, the government was ordered to delete the emails and attachments from its computers, and to delete the backup data from the computer server. Upon deleting the emails and backup data, the government was ordered to submit statements under penalty of perjury that such tasks had been completed. The government complied with the court's order and submitted affidavits by DHS Agents Dietrich, Castro, and Henych, indicating that all of the seized documents and data had been turned over to the custody of the court and deleted from the government's computers [D.E. 8, 9, 11]. Finally, the government was instructed to file a statement notifying Mr. Doe and the court of its intention with respect to the seized documents.

On April 12, 2011, the government filed a notice indicating that it would be submitting to the court an application for, and affidavit in support of, a search warrant [D.E. 17]. Pursuant to that sealed applica-tion, which I have since received, the government seeks to search the contents of the copies and electronic data now in the custody of the court. The government requested that the court place the filing under seal "to prevent the compromise of the ongoing investigation" [*Id.*]. As a result of the government's sealed application for a search warrant, Mr. Doe has filed a motion to compel the government to produce the affidavit in support of its search warrant application [D.E. 19] and a motion for a privilege review prior to the issuance of a search warrant [D.E. 23].

## II. Motion for Return of Property

Mr. Doe moves for the return of his property—i.e., the copies made of the seized documents. He argues that the targeted search and subsequent seizure of his property at MIA violated his Fourth Amendment right to be free from unreasonable searches and seizures.[3]

An individual's right to be free from an unreasonable search and seizure is generally protected by a requirement that searches and seizures be conducted pursuant to a warrant based on probable cause. *See* U.S. Const. amend. IV. *See also United States v. Tamari,* 454 F.3d 1259, 1261 (11th Cir.2006). Courts have, however, established numerous exceptions to this general rule. One such exception is the so-called border search exception, which allows the government to conduct routine searches of persons and effects entering the country without a warrant, probable cause, or even reasonable suspicion. A rationale for the border search exception is that the Fourth Amendment's balance of reasonableness is different at the interna-

---

**3.** Mr. Doe moves for return of his property pursuant to Rule 41(g) [D.E. 1]. As I have noted in a previous order, however, I do not have jurisdiction over this dispute pursuant to Rule 41(g) [D.E. 5]. Instead, jurisdiction exists pursuant to the court's equitable power to order the return of unlawfully seized property. *See In re the Matter of Sixty Seven Thousand Four Hundred Seventy Dollars ($67,-470.00),* 901 F.2d 1540, 1544 (11th Cir.1990).

tional border than in the interior of the country. *See United States v. Montoya de Hernandez,* 473 U.S. 531, 539, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). "[N]ot only is the expectation of privacy less at the border than in the interior ... [but] the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border." *Id.* at 539–40, 105 S.Ct. 3304 (citations omitted).

■ The scope of the government's power to conduct searches and seizures at the border is not completely clear. The border search exception is grounded in the "sovereign's long-standing right to protect itself." *United States v. Ramsey,* 431 U.S. 606, 616, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). *See also Montoya de Hernandez,* 473 U.S. at 538, 105 S.Ct. 3304 ("[Border search] cases reflect the longstanding concern for the protection of the integrity of the border."). In *Carroll v. United States,* 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543 (1925), one of the first cases recognizing the border search exception, the Supreme Court stated that "[t]ravelers may be ... stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in." Following *Carroll,* courts have allowed warrantless and suspicionless searches of persons and their effects at the border in order to prevent contraband (including undeclared and untaxed merchandise) and

aliens from entering the country. Specifically, courts have applied the border search exception to cases involving the smuggling of dutiable goods or currency, *see, e.g., United States v. Berisha,* 925 F.2d 791, 795 (5th Cir.1991), narcotics, *see, e.g., Ramsey,* 431 U.S. at 619–25, 97 S.Ct. 1972, child pornography, *see, e.g., United States v. Cotterman,* 637 F.3d 1068, 1070 (9th Cir.2011), and aliens, *see, e.g., United States v. Tsai,* 282 F.3d 690, 694–97 (9th Cir.2002).

Mr. Doe contends first that the government's actions exceeded the scope of the border search exception to the Fourth Amendment. After Agent Castro determined that there was no child pornography (or other contraband) on the electronic devices, the government returned the seized items to Mr. Doe. Yet the government retained imaged copies of the electronic devices on the belief that the devices contained evidence relevant to an ongoing criminal investigation. Although at least one court has allowed the warrantless search and seizure of documents at the border,[4] I need not reach this constitutional question.

■ Even if the government violated Mr. Doe's Fourth Amendment rights by seizing and copying his documents, another exception—the independent source doctrine—applies. Pursuant to this doctrine, evidence initially obtained by an illegal search or seizure may later be used by the government if it can show that the evidence would have been ultimately obtained independently of the initial illegality and in

---

4. In that case, border agents were aware that a bank manager had pending fraud charges, so they searched and seized his luggage at the airport without a warrant. The luggage contained financial documents, which the agents dredged through. The bank manager argued that the targeted search and seizure of his documents—as opposed to contraband—ex-

ceeded the government's powers at the border. A panel of the D.C. Circuit Court disagreed, however: "The distinction that [the manager] would draw between contraband and documentary evidence of a crime is without legal basis." *United States v. Gurr,* 471 F.3d 144, 149 (D.C.Cir.2006).

compliance with the Fourth Amendment. *See Murray v. United States,* 487 U.S. 533, 541–42, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).[5] In other words, "[s]o long as a later, lawful seizure is genuinely independent of an earlier, tainted one (which may be difficult to establish where the seized goods are kept in the police's possession) there is no reason why" the government should not be able to use the evidence previously obtained. *Id.* at 542, 108 S.Ct. 2529. To prohibit the government from using evidence "that the police ultimately obtained by independent legal means would not put the police in the same position they would have been in if they had not committed any illegal conduct; instead, it would put them in a worse position." *United States v. Markling,* 7 F.3d 1309, 1315 (7th Cir.1993).

One circumstance where courts have held that the government may use evidence initially discovered during an illegal search or seizure is where agents subsequently obtain the evidence pursuant to a valid search warrant based on information independent of the initial tainted search or seizure. *See, e.g., Murray,* 487 U.S. at 541–43, 108 S.Ct. 2529. In such a situation, the "ultimate question . . . is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue." *Id.* at 542, 108 S.Ct. 2529.

One case is particularly analogous. In *United States v. Budd,* 549 F.3d 1140 (7th Cir.2008), the defendant entered a conditional guilty plea to charges of receiving, distributing, and possessing child pornography after the district court denied his motion to suppress. Among the evidence the defendant sought to suppress was child pornography obtained from a laptop that was initially seized in violation of the defendant's Fourth Amendment's rights. *See id.* at 1147. The Seventh Circuit affirmed the denial of the motion to suppress. Notably, although the initial seizure was unlawful, the computer was not searched until the government obtained a search warrant 48 days later. *See id.* at 1148. Because neither the search warrant application nor the decision to obtain the warrant was based on information obtained as a result of the illegal seizure, the Seventh Circuit held that the evidence obtained pursuant to the search warrant was properly admitted at trial. *See id.* at 1147–48.

In this case, the government has applied for a warrant to search the documents seized from Mr. Doe, and supported its application with a sealed affidavit. Having reviewed the government's application for the search warrant and the supporting affidavit, I find that the affidavit establishes probable cause (independent of the initial seizure) to obtain and search Mr. Doe's files. I am therefore granting the government's application for a search warrant.

The independent source doctrine admittedly has some limitations. Any evidence obtained from the illegal search or seizure may not "taint" the legal search or seizure. So, for instance, evidence obtained from the illegal search or seizure may not be used as information to obtain a warrant to conduct a legal search. *See United States v. Bosby,* 675 F.2d 1174, 1180–81 (11th Cir.1982). If it does, then the evidence must be excluded. On the other hand, if the information used to obtain a valid war-

---

**5.** Although the doctrine is generally used to determine whether evidence is admissible at trial, the doctrine is not limited to that context. *See Silverthorne Lumber Co.,* 251 U.S. at 391–92, 40 S.Ct. 182. In my view, the doctrine is applicable here to determine whether the government may read and review documents previously seized in alleged contravention to the Fourth Amendment.

rant is independent of any evidence gathered from the illegal search or seizure, the evidence resulting from the warrant may stand.

The alleged illegal seizure here could have tainted the application and affidavit for the search warrant in two possible ways. First, the MIA seizure may have given the government evidence that it then used to obtain a warrant. Second, the seizure might have produced information that caused the government to seek a warrant. *See Markling,* 7 F.3d at 1315. I find, however, that prior to seizing the documents at issue the government had probable cause to believe that evidence relevant to its ongoing investigation would be found in Mr. Doe's possession. Moreover, besides the testimony that Agent Dietrich briefly thumbed through the hard copy documents for evidence of customs violations and that Agent Castro briefly looked through the images on the laptop for child pornography, there is no evidence that the government, including the affiant for the search warrant application, otherwise searched or reviewed the documents for evidence relating to its ongoing criminal investigation. Because the government had probable cause independent of the airport seizure to obtain a warrant for Mr. Doe's documents, and because there is no evidence indicating that the government's decision to apply for a search warrant was based on information obtained as a result result of the seizure, I find that the independent source doctrine applies. *See Budd,* 549 F.3d at 1147–48. Mr. Doe's motion for return of property is therefore DENIED.

### III. MOTION FOR PROTECTIVE ORDER

Mr. Doe also moves for a "protective order precluding [the government] from reviewing any of the seized items until a hearing is scheduled to determine the applicability of any privilege" [D.E. 1 at 1314]. Because the government has placed all the seized items in the custody of the court and because Mr. Doe has subsequently filed a motion for privilege review, the request for a protective order is DENIED AS MOOT.

### IV. CONCLUSION

Mr. Doe's motion for return of property is DENIED and his request for a protective order [D.E. 1] is DENIED AS MOOT.[6] An order on the other pending motions will be entered separately. The documents in the court's custody will not be released to the government until the other motions are resolved.

---

**6.** Of course, this ruling is not meant to preclude Mr. Doe from later challenging the admission of any evidence that may be obtained as a result of a search of the seized documents, should he be charged. *See, e.g., Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).