In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3832

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOHN T. AMBROSE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 CR 18—**John F. Grady**, *Judge.*

ARGUED FEBRUARY 25, 2011—DECIDED FEBRUARY 16, 2012

Before EASTERBROOK, *Chief Judge,* and ROVNER and
WOOD, *Circuit Judges.*

ROVNER, *Circuit Judge.* The U.S. Marshals Service is
the nation's oldest federal law enforcement agency,
having served our country since 1789 when President
George Washington appointed the first 13 U.S. Marshals
following the passage of the first Judiciary Act. U.S.
MARSHALS SERVICE, http://www.usmarshals.gov/
duties/factsheets/general-2011.html (last visited January 26,

2012). It is tasked with a wide variety of critical functions, among them the capture of fugitives from justice, the housing and transport of prisoners, witness security, and judicial security—including the protection of all federal judges. *Id*. Its performance has been consistently exemplary. For instance, in fiscal year 2010 alone, the Marshals Service arrested more than 36,100 federal fugitives. *Id*.

Those successes have not been without the greatest of sacrifices. Over its history, more than 200 persons in the Marshals Service have given their lives in service. http://www.usmarshals.gov/history/roll_call.htm. Nothing better captures the ethos of the Marshals Service than its motto: Justice, Integrity, Service. http://www. usmarshals.gov/history/seal.htm.

One of the most sensitive functions of the Marshals Service is the Witness Security Protection Program ("WITSEC"), also known as the witness protection program. Through that program, the Marshals Service provides for the security, health, and safety of government witnesses and their immediate family members, whose lives are endangered as a result of their testimony in the criminal prosecution of those involved in organized crime, drug trafficking, terrorism, and other major criminal enterprises. http://www.usmarshals.gov/duties/ factsheets/witsec-2011.html. Those prosecutions involve the most dangerous people, and the threat to the witnesses is real and substantial. Since the program's inception in 1971, the U.S. Marshals have relocated and protected more than 8,300 witnesses and 9,800 of their family members. *Id*. It is a testament to the dedication and profes-

sionalism of its members that in that time, no WITSEC participant who followed security guidelines was harmed while under the active protection of the U.S. Marshals. *Id*.

Without the protection of such high-risk witnesses, many of the most serious federal crimes would escape prosecution. In fact, our system of justice depends at its core on the integrity of its law enforcement officers and the ability to protect witnesses who testify against wrongdoers. John T. Ambrose, a Deputy U.S. Marshal, was convicted in district court on charges that go to the heart of those core principles. He is accused of betraying the confidentiality of WITSEC and revealing information to organized crime figures concerning the cooperation of witness Nicholas ("Nick") Calabrese, a "made" member of the mob. Such a betrayal could present a threat to the safety of Calabrese, his family, and even the Marshals protecting him.

The grand jury returned a four-count indictment, charging him in Counts 1 and 2 with stealing government property and disclosing without authorization information regarding Calabrese, a witness protected in the WITSEC program, in violation of 18 U.S.C. § 641 and 18 U.S.C. § 3521. In Counts 3 and 4, the grand jury charged him with making false statements to law enforcement agents regarding his conduct in violation of 18 U.S.C. § 1001. The jury found Ambrose guilty on Counts 1 and 2, and not guilty of Counts 3 and 4. The district court sentenced Ambrose to four years on each count, to be served concurrently, and 3 years' supervised release.

In pretrial motions, Ambrose moved to suppress inculpatory statements that he made to investigators. After an expansive hearing spanning six days of testimony, the district court denied that motion to suppress. Ambrose now appeals that determination, and also raises a number of challenges to the trial and sentence.

He alleges that the district court should have suppressed his statements because he was subjected to custodial interrogation without receiving the *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 445 (1966). In addition, he asserts that the trial court improperly allowed the admission of evidence in violation of the hearsay rule and the Confrontation Clause of the Sixth Amendment, and erred in providing a supplemental instruction of law to the jury. Finally, Ambrose argues that the court improperly sentenced him in that it engaged in speculation and failed to consider the § 3553(a) factors.

I.

In 2002, Nick Calabrese began cooperating with the government in the investigation of a number of unsolved murders. He was a "made" member of the Chicago Outfit, also known as the Chicago mob or mafia, who was believed to have participated in 16 murders and to have knowledge of 22 murders. A made member is someone who has gained a heightened role in the Outfit by proving himself based upon his trustworthiness and performance. A person would not even be considered for that status until he had committed a homicide on behalf of the Outfit. Because he was a made member,

Calabrese was privy to a great deal of information and access. By all accounts, he was the most important organized crime witness who had ever testified in this district, and would become a key witness in what was known as the "Family Secrets" case which brought RICO charges against the Outfit. In order to secure his cooperation and his safety, Calabrese was accepted into the WITSEC program on approximately August 27, 2002.

In the course of his cooperation, Calabrese traveled to Chicago on two occasions, the first on October 31 to November 1, 2002, and the subsequent trip between May 20 and May 23, 2003. He stayed at a "safe house" where he was guarded by Deputy U.S. Marshals on both trips. The government soon received information indicating that Calabrese's cooperation had been discovered by organized crime figures, and that one of the persons guarding him may have been a source of that information. In court-authorized audio and visual recordings made between organized crime figures Michael Marcello and his brother James at a federal penitentiary, the Marcellos were heard discussing that information had been provided by the "babysitter" of an organized crime member. At the time, the authorities had not ascertained the identity of the "babysitter."

Additional information was revealed in subsequent recordings. Because the Marcellos spoke in coded terms, and utilized gestures in place of words at times, the authorities had to piece together interpretations of the conversation from the audio and visual tapes. For instance, on January 30, 2003, Michael Marcello indicated to James

that "[t]he big thing with them is the Zhivago deal." From prior experience, the federal investigators had ascertained that "Zhivago" was used as a reference to the murders of Michael and Anthony Spilotro—unsolved murders of which Calabrese had information.[1] James replied, "he said something about that, they said? I thought it was in another direction?" to which Michael responded, "we don't know what he said about that. . . . But I'm telling you, you're in there. You know, how far, whatever. I don't know. The guy can only do what he can do. You know what I'm saying?" James then asked, "[w]ell, that's all he saw was names?" to which Michael replied, "[t]he guy had the notes [putting hands out as if indicating a pad of paper.] Everything he was writing down . . . . Went through the guy's notes."

The threat assessment that was part of Calabrese's WITSEC file had indicated that he participated in 16 murders and had knowledge of 22 other murders. The investigators were therefore alarmed to hear similar numbers and wording mentioned by the Marcellos during a March 6, 2003, visit, stating "[h]e didn't say that he did nineteen of them things . . . . He said . . . [t]hose that participated in and had knowledge of . . . nineteen of them things . . . [n]ot that he was." The government had not released information to the public of the large number of murders to which Calabrese admitted involvement or knowledge.

---

[1] The Spilotro brothers' exploits as part of the mob and their murder was the basis for the movie *Casino*.

In a conversation two weeks later, the recorded conversations again identified "the guy" who was giving information as "the babysitter." Michael asked James if he knew Tony DeRango, a "copper," and James stated that he "grew up with him" in "our old neighborhood, that district." Michael then explained in typical cursory fashion, "Marquette, the Marquette Ten," and that DeRango was friends with "this guy." He further states "another guy by the name of Guide. Guide was close to this guy." Michael continued, "they both were, really both of them. They both knew him from Marion Camp [an apparent reference to the Federal Prison Camp in Marion, Illinois]. . . . This kid's father was with them . . . . On that beef and everything. He went down with them. He died though . . . . The kid's father died. So they like, you know, the kid comes down. You know what I mean?"

Further evidence of a leak in the program was apparent in a conversation on June 12, 2003. Michael revealed to James, "you know that kid that, that kid that handles him once in a while? . . . You know, he was there . . . . He was there for a week. A little over a week . . . . Right in front of the thing. They were driving him all over the city. Showed 'em the [unintelligible] . . . . He took 'em there, down east by Pagliacci that way." [pagliacci means clown in Italian, and is understood as a reference to Chicago Outfit member Joseph "the Clown" Lombardo]. Michael also revealed that Calabrese had been taken to the Bridgeport area, which is near U.S. Cellular Field, the stadium for the White Sox. Michael continued, "Now this is, this is from like yesterday . . . . Oh, the Moulieri [Italian slang for "wife"] . . . [t]hree times [gesturing with hand to

head] . . . [h]e dialed the phone number himself, the kid. He said the kid dialed the phone number." Just a few weeks before that conversation, Calabrese had traveled to Chicago for three days, during which time agents took him around the city including the area around U.S. Cellular Field to identify the locations of murders and sites where bodies were buried. Calabrese called his wife from the safe house at least twice during that time.

Although the investigators were thus aware that information was getting to the Chicago Outfit concerning Calabrese's movements, they were not able to identify the source of the leaks. That changed in 2006, when more accurate equipment allowed them to hear the reference to the "Marquette Ten," which they previously had understood to be "Marquette Temple." The Marquette Ten case in Chicago was a federal racketeering case in which a number of Chicago Police Officers, including Thomas Ambrose, father of the defendant, were convicted and sent to prison. Thomas Ambrose was incarcerated and died of a heart attack during that imprisonment. Two of his co-defendants in that case, William Guide and Frank DeRango, were incarcerated during some of their prison terms with members of the Chicago Outfit—Guide with John "No Nose" DiFronzo and DeRango with Joey "the Clown" Lombardo. Armed with the new information, the agents connected the defendant Ambrose to the "babysitter" whose father was a "copper" who "went down" with DeRango and Guide in the Marquette Ten case and died in prison. Ambrose had been one of the Deputy U.S. Marshals assigned to protect Calabrese during his visits to Chicago. In those overnight

visits, Ambrose would have had access to Calabrese's WITSEC file at the safe house. Parts of the WITSEC file were copied and distributed at the safe house in stapled packets, but other parts of the file were not handed out.

Fingerprint examination of Calabrese's WITSEC file revealed two prints matching Ambrose, one on a facsimile cover sheet atop the application and one from his right ring finger on the inner side of the last page. Neither of those pages had staple holes that would have been present for the papers that were copied and distributed as briefing materials, thus indicating that Ambrose had accessed additional material.

In light of that information, the government believed it had enough evidence that Ambrose had conveyed information to the Chicago Outfit that it could charge him with the crimes of theft of government property and unauthorized disclosure under 18 U.S.C. §§ 641 & 3521. The government did not yet know, however, the extent of the breach, and who else was involved in the matter. As a result, it sought to gain Ambrose's cooperation in the hopes of identifying any persons involved in passing the information from Ambrose to the Marcellos. In addition, although the agents were aware that Ambrose had re-vealed information, they had not ascertained whether the revelation was purposeful or inadvertent. The agents determined that Ambrose would respond in the most positive manner if persons higher in law enforcement whom he respected were the ones who approached him. Ambrose himself held a high position in the U.S. Marshals Service, serving as a deputy and as essentially

the second in command of the Great Lakes Regional Fugitive Task Force. Accordingly, they decided that the U.S. Attorney for the Northern District of Illinois, Patrick Fitzgerald, and the FBI Special Agent in Charge ("SAC") Robert Grant would conduct the initial interview. The plan was to confront Ambrose with the evidence, and once he decided to cooperate they would then turn him over to investigators who were more familiar with the intricate details to conduct any interrogations.

The government officials were concerned, however, as to how Ambrose would react. From both personal experience and from information provided to them in the course of their duties, they were aware that there was a very real danger of a violent response, and particularly the potential for "suicide by cop." Grant had personally experienced such a situation in his time in the law enforcement community, and Michael Prout, the Chief Deputy U.S. Marshal for the Northern District of Illinois, had served as a team leader of the U.S. Marshals Service Critical Incident Response Team and had been trained on the risks of law enforcement suicide in circumstances where a law enforcement officer faced loss of position or family. U.S. Marshal Kim Widup had indicated that Ambrose was known as a high-strung highly-trained individual for whom the job meant everything, and that as a result he was a potential suicide risk given the circumstances he would be facing. The concern was exacerbated by Ambrose's personal history. Given his experience as a child with his father being convicted and dying in prison, there was a heightened concern with that possibility.

Accordingly, a decision was made that before confronting Ambrose, his weapons would be secured to ensure the safety of Ambrose and those around him. Toward that end, a ruse was constructed whereby Ambrose's supervisor, Prout, informed Ambrose that he needed to report to the FBI building for a meeting concerning a fugitive. The FBI building was newly-built and had extensive security including a guardhouse that was physically separate from the building, through which all visitors had to pass. All visitors were required to submit to a metal detector and to relinquish any weapons, cell phones, and other personal effects. By scheduling the meeting for that venue, the agents could ensure that Ambrose would not have weapons in his possession when he was informed of the investigation and potential charges. In addition, the remoteness of the location would help to keep the proceedings confidential, which was particularly important if Ambrose agreed to cooperate in the investigation. Because Ambrose was a Deputy U.S. Marshal, any meetings in the U. S. Attorney's Office in the court building would have been very difficult to keep secret.

On September 6, 2006, Ambrose proceeded to the FBI building and met Prout there shortly before 10:00 a.m. They relinquished their weapons and cell phones at the guardhouse. As part of the building security, visitors were escorted when traveling throughout the building and in keeping with that, Ambrose and Prout were escorted to the conference room located just outside SAC Grant's office on the 10th floor. At that time, Grant walked Prout out of the room, and Fitzgerald chatted with

Ambrose briefly about the extensive security at that new building and how their cell phones had been taken. Grant returned quickly, which left Ambrose alone with Fitzgerald and himself. Fitzgerald had brought with him both audio and video recordings of the Marcello conversations, as well as an as-yet-unfiled unsigned affidavit which had been prepared to be used in the event of an arrest. In fact, the U.S. Attorney's office had made a number of preparations for the possibility of an arrest that day, including drafting a press release and contacting a local jail in case there was a need to incarcerate Ambrose while maintaining secrecy.

Fitzgerald anticipated that the meeting would be a short one in which he and Grant would reveal to Ambrose the information that they had regarding his criminal involvement, and give a pitch for him to cooperate in the investigation. If Ambrose agreed to cooperate, he would be handed off to agents who were more familiar with the details of the investigation and they would conduct an interrogation.

Fitzgerald and Grant both testified that they informed Ambrose that he was not under arrest but that prosecution was a possibility. Although Ambrose disputes that he was told he was not under arrest, the district court credited the testimony of Fitzgerald on the matter, and Ambrose has presented no basis for us to disturb that finding. Fitzgerald proceeded to reveal the evidence that had been gathered implicating Ambrose, and provided Ambrose with a transcript to read along with as they played the tapes of the Marcello conversa-

tions. When Fitzgerald mentioned that Ambrose's finger-prints were found on the WITSEC file, Ambrose initially denied accessing a file, but later asked whether his fingerprints were on the outside of the file. Fitzgerald then told him that a fingerprint was also found on an inside page, and assured Ambrose that he was not lying about the fingerprint evidence. Ambrose then conceded involvement, stating that he "screwed up" but that it was not what they thought it was. He elaborated, saying that he "shot his mouth off" but that he "would never take money." Fitzgerald assured Ambrose that they were quite confident he had not taken money.

Ambrose also disputed some of the information that the two presented, indicating that he did not know some of the people mentioned in the tapes, and had not engaged in certain actions such as making the phone calls to Calabrese's wife.

Throughout the conversation with Fitzgerald and Grant, Ambrose repeatedly expressed concern about losing his job. He mentioned at one point that Fitzgerald had a lot of clout and could help him keep his job. Fitzgerald responded to those inquiries by emphasizing that Ambrose was possibly facing prosecution, and that he was not the decisionmaker regarding Ambrose's employment but that it would seem to be a tough road for him to retain it. While Ambrose was speaking with Fitzgerald, a number of agents were positioned outside the two doors of the conference room. All were in business attire and were unarmed throughout the time. A total of nine to twelve agents participated in

the security detail that day. According to the testimony, their purpose was to provide security in the event that Ambrose reacted violently. Approximately two agents were stationed outside each of the open exit doors. No agents were present in the room during the meeting and the testimony indicates that the agents were only occasionally visible from the conference table where Ambrose, Fitzgerald and Grant were sitting.

After meeting with Fitzgerald and Grant for about an hour, Ambrose indicated a desire to cooperate but asked to speak first with Marshal Kim Widup, Jerry Hansen—who is Ambrose's uncle and a courtroom security officer, and Chief Inspector Jeff Shank—who was his immediate supervisor. Fitzgerald and Grant acceded to that request and Grant contacted Widup, who was still in the building, to arrange for the men to come to the site. Fitzgerald and Grant left the room to make those arrangements, and Ambrose stood up and moved from the table. Concerned that Ambrose was in the room alone and uncertain of his state of mind, Agent Andrew Hickey entered the room and in a stern voice said, "Sir, could you please sit down." When Ambrose indicated that he was just stretching his legs, Agent Hickey took a few more steps into the room and repeated the request, at which time Ambrose returned to his seat.

During the subsequent break in the proceedings as they awaited the arrival of the men Ambrose wanted to see, Ambrose asked to use the restroom. Ambrose

testified that when he left the conference room to proceed to the restroom, he noticed a large number of FBI agents outside the conference room. Approximately three to eight of those agents escorted him to the restroom, with at least one in front, to his side and behind him. The restroom has doors on both sides of it, allowing access from—and egress to—two hallways in the building. Agents accompanied Ambrose into the restroom, with some standing near the two doors and one standing within 8 feet of the stall Ambrose had entered. Although testimony indicated that visitors were escorted within the FBI building, the district court made no finding on that matter, but by all accounts the number of agents accompanying him was not the norm. When he first left the conference room to use the restroom and saw the agents stationed outside it, Ambrose said "don't worry, I won't do anything stupid," which was construed by the government as a reference to its concern that he would attempt suicide, but was characterized by the defense as a statement that he would not try to flee.

Eventually, Widup, Shank and Hansen arrived, and Ambrose met privately with each of them individually in the conference room. Fitzgerald briefly outlined the situation to the men before they met with Ambrose, but did not request that they ask Ambrose anything and did not place time or other limits on their conversation with Ambrose. No one monitored the conversations between Ambrose and the individuals. Fitzgerald spoke with Hansen following Hansen's conversation with Ambrose and asked him what he thought of the possibility

of holding Ambrose in a jail if Ambrose was cooperating in order to make sure Ambrose was safe. Hansen indicated that he thought it was a terrible idea and as a result Fitzgerald became convinced that it was not an option that should be pursued.

In their earlier discussions with Ambrose, Grant and Fitzgerald had discussed that Ambrose should meet with other agents to provide any details and to cooperate in the investigation rather than to remain with them. After meeting with Widup, Hansen and Shank individually, however, Ambrose asked to speak once again with Fitzgerald and Grant—with Hansen present as well. They agreed to do so, and in that meeting Ambrose spoke at length, providing information about Guide and DeRango, their contact with Lombardo and DiFronzo, and the information that he gave to Guide concerning Calabrese. Grant interrupted the conversation at that point, directing Ambrose to the case agents who were prepared to do a more comprehensive interview with him. This second discussion with Grant and Fitzgerald lasted only half an hour before he was directed to the case agents.

Those agents provided Ambrose with *Miranda* warnings at the start of their interview. Ambrose then proceeded to again recount details of his actions that related to the disclosure of WITSEC information.

Throughout their testimony, Fitzgerald and Grant characterized their interactions with Ambrose as a meeting designed to be a short pitch to alert Ambrose to the potential charges and encourage his cooperation, followed by a handoff to case agents who were familiar

with the details of the investigation for questioning. They indicated that it went much longer than anticipated because Ambrose asked numerous questions and expressed a desire to talk with them rather than their subordinates. The defense, on the other hand, asserts that the dual interviews were set up as a two-step process designed to circumvent *Miranda*, in which Ambrose would be encouraged to implicate himself prior to the giving of *Miranda* warnings. *See Missouri v. Seibert*, 542 U.S. 600 (2004); *United States v. Stewart*, 536 F.3d 714, 722 (7th Cir. 2008). The first issue, then, is whether the district court erred in allowing the admission of statements made by Ambrose to Fitzgerald and Grant in the absence of any *Miranda* warnings, and whether those actions rendered his other, post-*Miranda*, statements inadmissible as well.

## II.

The admonitions set forth in *Miranda* were designed to safeguard the constitutional guarantee against self-incrimination. *J.D.B. v. North Carolina*, ___ U.S. ___, 131 S. Ct. 2394, 2401 (2011). The *Miranda* Court recognized that the inherently coercive nature of custodial interrogation could blur the line between voluntary and involuntary statements, and that the prophylactic measures were necessary to protect the constitutional right. *Id.* at 2401. Accordingly, *Miranda* held that the government may not use statements stemming from the custodial interrogation of a defendant unless the government has utilized procedural safeguards effective to secure

the privilege against self-incrimination. *Berkemer v. McCarty*, 468 U.S. 420, 428 (1984).

That does not mean that any statements obtained by the government in a conversation with a defendant are excluded unless preceded by *Miranda* warnings. *Miranda* warnings are not required merely because the person being questioned is a suspect or the focus of a criminal investigation. *United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2006). The privilege against self-incrimination is not imperiled by every conversation with the government. Instead, the concern in *Miranda* was with the inherently coercive nature of custodial interrogation. Accordingly, a suspect must be both in custody and subjected to interrogation before *Miranda* warnings are required. *Berkemer*, 468 U.S. at 428; *Miranda*, 384 U.S. at 444; *Barker*, 467 F.3d at 628.

A person is "in custody" for *Miranda* purposes if there was a formal arrest or a restraint on his or her freedom of movement of the degree associated with a formal arrest. *J.D.B.*, 131 S. Ct. at 2402; *United States v. Podhorn*, 549 F.3d 552, 556 (7th Cir. 2008). Some of our cases have characterized the test as whether the person is deprived of his or her freedom of action in any significant way. *United States v. Snodgrass*, 635 F.3d 324, 327 (7th Cir. 2011) citing *United States v. Thompson*, 496 F.3d 807, 810 (7th Cir. 2007). This inquiry is an objective one. Neither the subjective views of the suspect being questioned nor that of the officer engaging in the questioning is considered. Rather than focus on the idiosyncrasies of individuals that can impact how questioning is per-

ceived, the Court has opted for an objective test that asks how a reasonable person in the suspect's position would have understood the situation. *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004); *Podhorn*, 549 F.3d at 556; *J.D.B.*, 131 S. Ct. at 2402. The Court has identified two discrete inquiries critical to that determination: "(1) what were the circumstances surrounding the interrogation; and (2) would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *J.D.B.,* 131 S. Ct. at 2402; *Podhorn*, 549 F.3d at 556. Once that is determined, courts apply the objective test to resolve the ultimate inquiry—whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *Yarborough*, 541 U.S. at 663.

Once a person is determined to be in custody, the second inquiry considers whether he was subjected to interrogation. As we noted in *United States v. Swanson*, 635 F.3d 995, 1001-02 (7th Cir. 2011), "not all statements obtained after a person is in custody are considered the product of interrogation." Law enforcement officers are not prohibited from merely listening to a person's voluntary statement. *United States v. Richardson*, 657 F.3d 521, 525 (7th Cir. 2011). Interrogation that would trigger the *Miranda* requirements includes questioning by the officers or any words or actions that the officers know or should know are reasonably likely to elicit an incriminating response. *Swanson*, 635 F.3d at 1002; *Richardson*, 657 F.3d at 525; *United States v. Knope,* 655 F.3d 647, 652 (7th Cir. 2011).

Finally, even if a *Miranda* violation is found, that does not render all later statements automatically inadmissible. *Richardson*, 657 F.3d at 524. Subsequent statements by the suspect not made in response to unwarned custodial interrogation can be admissible in certain circumstances. Briefly, where the previous un-Mirandized statements were nevertheless voluntary, subsequent statements made after *Miranda* warnings are provided are admissible. *Richardson*, 657 F.3d at 525; *Swanson*, 635 F.3d at 1004. Where the earlier unwarned statements are involuntary, then later statements provided after *Miranda* warnings are admissible only if there is a sufficient break in the stream of events to insulate the second confession from the earlier taint. *Id*. "A statement is voluntary if, 'in light of the totality of the circumstances, [it] is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that overcome the defendant's free will.'" *Richardson*, 657 F.3d at 525, quoting *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998); *Stewart*, 536 F.3d at 723. Coercive police activity is a necessary predicate to determining that a confession is involuntary. *Richardson*, 657 F.3d at 525; *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005). The government has the burden of demonstrating that a confession is admissible, and must prove by a preponderance of the evidence a defendant's waiver of his *Miranda* rights and the voluntariness of the confession. *Stewart*, 536 F.3d at 719.

III.

The district court in this case conducted an extensive suppression hearing to determine the admissibility of the pre-*Miranda* statements by Ambrose, and concluded that the statements were admissible because they were not the product of a custodial interrogation. We review that determination *de novo*, but consider factual findings only for clear error. *United States v. Pillado*, 656 F.3d 754, 770 (7th Cir. 2011).

We turn, then, to a consideration of whether Ambrose was subjected to a custodial interrogation without *Miranda* warnings, rendering his statements to Fitzgerald and Grant inadmissible. We can easily dispense with the second part of that inquiry, because the interview with Fitzgerald and Grant was an interrogation for *Miranda* purposes. The testimony at the suppression hearing revealed that, in the meeting, Fitzgerald presented Ambrose with the evidence indicating that Ambrose had provided information from the WITSEC files to members of the Chicago Outfit. Ambrose described the tone of the encounter with Fitzgerald and Grant as businesslike, and there is no evidence that it was either hostile or threatening. The focus of the meeting was on conveying information to Ambrose rather than any systematic questioning of him. It nevertheless was an "interrogation" for *Miranda* purposes because Fitzgerald and Grant should have known that confronting Ambrose with evidence of his guilt was likely to elicit an incriminating response, and the government does not argue otherwise. *See Swanson*, 635 F.3d at 1002; *Richardson*, 657 F.3d at 525; *Knope*, 655 F.3d at 652.

A closer question is whether Ambrose was "in custody" for *Miranda* purposes when he spoke to Fitzgerald and Grant in the conference room. We have identified a number of factors that are indicative of whether a person should be considered in custody, including whether:

(1) the encounter occurred in a public place;

(2) the suspect consented to speak to the officers;

(3) the officers informed the individual that he was not under arrest;

(4) the individuals were moved to another area;

(5) there was a threatening presence of several officers and a display of weapons or physical force;

(6) the officers deprived the suspect of documents needed to depart; and

(7) the officers' tone of voice was such that their requests would likely be obeyed.

*Barker*, 467 F.3d at 629. That list is indicative of the areas that a court should consider, but is not exhaustive.

Ambrose engaged in three distinct meetings on that day, each of which yielded incriminating statements. Therefore, we examine the circumstances surrounding each stage to determine whether a reasonable person in those circumstances would have felt free to terminate the interrogation and leave. *J.D.B.*, 131 S. Ct. at 2402; *Podhorn*, 549 F.3d at 556.

The first encounter occurred when Ambrose was sum-
moned to a meeting at the FBI building with Prout. Where
a person voluntarily agrees to meet with law enforce-
ment agents, that weighs against a finding that the
person could reasonably believe he is in custody.
*Yarborough*, 541 U.S. at 661. Ambrose, however, was
an unwitting participant in this whole endeavor. He
was drawn there through a ruse, under which he essen-
tially was ordered to report to the meeting as part of
his job. Therefore we cannot say that he was there of
his own accord, and this factor weighs toward a finding
of custodial interrogation—although it is hardly disposi-
tive of the matter.

Once Ambrose arrived at that locale, he was required
to relinquish any weapons, cell phones, keys, and similar
items before entering the FBI building. He and Prout
were then escorted through the building to the con-
ference room. Those measures, though having the effect
of impeding Ambrose's ability to communicate with
the outside world, are not indicative of custody to a
reasonable person because the security restrictions were
uniformly applied. Nothing in that treatment of Ambrose
would cause a reasonable person in his situation to
believe that they were not free to leave. In fact, we ad-
dressed a similar situation in *United States v. Budd*, 549
F.3d 1140, 1145 (7th Cir. 2008). Budd agreed to go to the
police station to be interviewed regarding possession
of child pornography. Although his interview took place
in a "soft" interview room that had carpet and com-
fortable furniture, the building security was such that
he was not allowed to move throughout the building

without one of the officers escorting him. *Id*. at 1145-46. That included an escort when he used the restroom. *Id*. at 1146. He was taken to a secure bathroom that did not allow occupants to open the door or flush the toilet from the inside, and required an officer on the outside to let him out. *Id*. The security requirements of the police station were not enough to transform a non-custodial voluntary interview into a custodial one. *Id*. The security provisions applied to all non-staff persons, and the court held that a reasonable person in Budd's position would have believed that he or she was free to leave. *Id*. Similarly, the FBI building requirements that mandated escorts for visitors is not in itself a basis for a reasonable person to believe that he is not free to leave.

In addition, the physical setting of the meeting itself did not signal a restriction on the freedom to leave. Where an encounter with law enforcement occurs in a public place, the Court has recognized that the public nature of the interaction and the ease of leaving limit the coercive impact. *Berkemer*, 468 U.S. at 438. The conference room here was in a secure building that could be traversed only with an escort, so it certainly lacks the advantages of the public place. The tenth floor, however, was an active floor with many people and thus there was no aspect of isolation. Moreover, rather than employ the locked, secured interview rooms on the first floor in which prisoner processing occurs, the government in this case used a spacious conference room used by SAC Grant outside of his office for the meeting with Ambrose. Therefore, the room itself did not

physically prevent Ambrose's exit, nor did it suggest that he was under arrest. In *United States v. Slaight*, 620 F.3d 816, 819 (7th Cir. 2010), we were presented with a situation in which the dimensions and layout of the interview room itself created a barrier to departure, and created an environment in which the suspect would not feel free to leave. In that case, the windowless room was described as either 8 by 8 feet or 5 by 7 feet— so small that the court strongly suggested that it never again be used to conduct a witness interview. *Id*. In that lilliputian space, the arrangement meant that one detective was essentially blocking the door, such that the suspect would have had to ask him to move or brush by him in order to exit. *Id*. That context contributed to the determination that a reasonable person would not feel free to leave. We have no such setting here. The conference room contained a table capable of seating more than 20 people. Fitzgerald, Grant and Ambrose gathered around one end of the table. The room contained two doors, which remained fully or partly open throughout the interview. It was not a room traditionally used for interviewing a suspect.

In addition, only Grant and Fitzgerald were in the room with Ambrose. They both were in business attire and unarmed. No other agents were in the room throughout any of the meetings with Fitzgerald and Grant. A number of agents were stationed outside the door, but Ambrose testified only that he was generally aware that some agents were in the area outside the conference room. Secretaries were also stationed in that area. Ambrose testified that he was seated at the conference room table

with his back to the doors, and thus there is no evidence that he could see the agents as they occasionally looked into the room to check on the status of the occupants. Those agents were also in business clothes rather than uniforms, and were unarmed. Ambrose also acknowledged that the tenor of the conversation with Fitzgerald and Grant was businesslike. There is no indication that the conversation became hostile or combative, and it consisted primarily of Fitzgerald presenting the evidence of Ambrose's involvement rather than questioning Ambrose. *See Budd*, 549 F.3d at 1145, *United States v. Littledale*, 652 F.3d 698, 701 (7th Cir. 2011) (indicating the relevance of the tone of voice).

The court also found that Grant and Fitzgerald had explained to Ambrose that they were concerned for his safety, and particularly his mental state and the potential that he would try to hurt himself or attempt suicide. Ambrose was therefore aware that the agents were concerned about him committing suicide or otherwise injuring himself and in that light the presence of any agents would have been much less ominous.

The circumstances surrounding the interview were therefore not indicative of custody, but if any doubt remained it would have been dispelled when, as the district court found, Fitzgerald informed Ambrose that he was not under arrest. Ambrose acknowledged that he never asked if he was free to leave, and also stated that Fitzgerald told him he could face future charges. In light of Fitzgerald's statement that he was not under arrest and his reference only to the possibility of future

charges, a reasonable person in that situation would have believed that he could terminate the discussion and leave. Accordingly, at the time of his initial interview, Ambrose was not in custody.

About an hour into his meeting with Fitzgerald and Grant, Ambrose indicated a willingness to cooperate but first a desire to meet with Marshal Kim Widup, Jerry Hansen—Ambrose's uncle and a courtroom security officer, and Chief Inspector Jeff Shank—his immediate supervisor. The trio then took a break while Grant contacted those persons, which effectively ended the first stage of the interview. After Fitzgerald and Grant exited the conference room, Ambrose stood up and walked a few feet around the conference room. An agent entered the room and twice requested that Ambrose "please sit down," leaving only after Ambrose complied. That restriction on his ability to even move about the conference room certainly could cause a reasonable person to question whether he was free to leave.

That impression was furthered to some extent when Ambrose then asked to use the restroom. According to his testimony, when Ambrose left the conference room he noticed that there were FBI agents posted outside the door. By most accounts, 4-5 agents accompanied Ambrose to the restroom, but the recollections varied from 3 to as many as 8 agents. At least some of the agents followed him into the restroom, with two standing near the exit doors and one stationed within 8 feet of the bathroom stall. That is the type of law enforcement presence that could cause a reasonable person

to believe that he is not free to leave. The secure nature of the building lessened that impact slightly, in that the interview was on a working floor and therefore a reasonable person could readily expect that visitors would not be allowed to wander unsupervised. Moreover, the bathroom contained two doors on opposite sides opening to different hallways, so that if any escort was required it would encompass at least the coverage of those doors. In addition, Ambrose was aware of concerns for his safety, and that concern provided an explanation for the escorts unrelated to the desire to detain him. As the day progressed, Ambrose noted that smaller numbers of agents accompanied him on restroom trips, which is in keeping with the notion that the agents were there for his safety, and their concerns with his reaction lessened as the day progressed. Nevertheless, the large number of agents and their proximity to Ambrose could cause a reasonable person to question whether he was free to leave.

Without more, it would be a close question as to whether a reasonable person would believe himself to be in custody at that stage. *See Budd*, 549 F.3d at 1146 (escorts, even of an intrusive level to a restroom, held not enough to cause a reasonable person to believe he was not free to leave where it was based on building security requirements and he had voluntarily agreed to the interview there). Any impression that his actions and movements were restricted, however, was negated by what followed. Widup, Hansen and Shank indeed met with Ambrose, and the circumstances surrounding those conversations were inconsistent with a person

who was under arrest. Ambrose was able to meet with each of those persons alone in the conference room, on an individual basis. No law enforcement official was present or eavesdropped on the conversation, and no restrictions were placed on the content of the conversation or its length. Ambrose then asked to have Hansen present when he met again with Fitzgerald and Grant. Fitzgerald agreed to that conversation, and at that time Ambrose confessed in more detail. Any impression of custody created by the escorts is negated by the free access to several individuals, and the lack of any law enforcement presence during those conversations. Moreover, Ambrose asserted control over who he would speak with in this second stage, enabling him to speak with Fitzgerald and Grant again with Hansen present. Particularly in light of Fitzgerald's earlier statements to him that he was not under arrest, those factors indicate that a reasonable person would not believe that he was in custody for the second stage of the interviews as well.

After that meeting, Ambrose was taken to meet with other agents, who administered the *Miranda* warnings. Because none of the pre-*Miranda* statements were made while Ambrose was in custody, the district court properly admitted the post-*Miranda* statements as well.

We note that the most probative factor for the district court in determining that there was not a custodial interrogation were statements by Ambrose throughout the day indicating that he was concerned about getting to his son's parent-teacher conference on time that night.

In contemplating the time that he would depart, those statements reflect Ambrose's state of mind and indicate that he did not believe he was under arrest. A person's subjective state of mind however, is not relevant in determining whether he or she is in custody for *Miranda* purposes. If used at all, those statements would have to be used to indicate the atmosphere and how that would impact a reasonable person's perception.

The statements were made in the third stage of interviews, when Ambrose was with the case agents. Ambrose asked how long the interview would take because he needed to attend a parent-teacher conference that night. The agents responded that they were not sure how long it would take to go through the questioning. Ambrose's statement is evidence that the atmosphere was not intimidating, and the agent's response is relevant to determining whether a reasonable person would feel free to leave. The agent did not dismiss his concern by stating that he was not going home, but rather considered the length of time that the questioning might take. That would further lead a reasonable person to think that he was free to leave. Ambrose called his wife twice in regard to that conference, and also called Hansen during an interview to ask him a question. That further indicates a level of freedom inconsistent with a custodial situation. Those factors, although occurring later in the day, are relevant in assessing the overall atmosphere at the time of the three interviews.

Finally, Ambrose briefly contends that the statements he made were not voluntary. Citing *Garrity v. New Jersey*,

385 U.S. 493, 497-98 (1967), he maintains that police officers should not be faced with the choice to either forfeit their jobs or to incriminate themselves. Ambrose argues that he was presented with such a choice because of the comments by Fitzgerald and Grant that he might face criminal charges and Marshal Widup's advice to him to cooperate and tell the truth. Those circumstances do not render his statements involuntary. Regarding his conversation with Fitzgerald and Grant, Ambrose has failed to identify any pressure or coercion other than that faced by any person presented with evidence that he has committed a crime. There was absolutely no indication that Fitzgerald or Grant threatened him with the loss of his job if he failed to cooperate. In fact, Ambrose acknowledges that Fitzgerald repeatedly informed him that the decision as to Ambrose's job was not in Fitzgerald's control. Any fear of job loss that Ambrose experienced stemmed from the nature of Ambrose's conduct, which involved the use of his position for criminal acts. Nor is it relevant that Marshal Widup encouraged him to cooperate. Ambrose sought the counsel of Widup, and the government arranged for him to speak with Widup. The government neither told Widup what to say nor did it even monitor the conversation with Ambrose. Ambrose cannot complain that he followed the advice of the person that he sought out. There is no evidence of government coercion here that would render the statements involuntary. *Richardson*, 657 F.3d at 525; *Jacobs*, 431 F.3d at 108. Accordingly, the court did not err in

denying the motion to suppress and allowing the use of those statements at trial.


IV.

Ambrose also raises an evidentiary challenge, arguing that the court erred in allowing the government to introduce hearsay statements, and in refusing to allow Ambrose to use similar statements under the rule of completeness. This challenge centers on the statements made by the Marcellos in their conversations at the prison that were taped by the government.

As we set forth earlier, in those conversations, the Marcello brothers discussed information that they had obtained indicating that Nick Calabrese was cooperating with the government in investigating unsolved murders including the Spilotro murders. In that discussion, the Marcellos described the source of that information as a person who was a "babysitter" for Calabrese who had access to notes on him and whose father had been friends with Guide and DeRango, convicted in the Marquette Ten trial, and died in prison.

Before trial, the government sought to use all of those conversations as admissions by coconspirators, and submitted a proffer under *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978). The district court denied that motion, holding that the Marcellos were not part of a conspiracy with Ambrose and that the statements could not be used for that purpose. The court held that the statements therefore constituted inadmissible hearsay if

introduced for the truth of the matter. Although the statements could not be used for their truth, the court allowed limited use of some of the statements as evidence that the leaked information was in fact received by someone. In addition, the statements could be used as circumstantial evidence of the identity of the source of the information in that the type of information received could only have been known—and thus revealed—by a limited number of persons. For instance, the Marcellos discussed that Calabrese was providing information regarding 19 murders, that he had been to Chicago over multiple days and was driven around to various locations including near U.S. Cellular Field, and that he had contacted his wife by phone three times during that visit. That evidence could be introduced not to prove that those things in fact happened, but to demonstrate that the information received by the Marcellos was information that would only have been available to persons involved in the WITSEC protection of Calabrese.

Throughout trial, Ambrose renewed his standing objection to the court's decision that the government could use the statements from the Marcello tapes. That decision by the court, however, was a correct one. The court properly prohibited the use of those statements for the truth of the matter. The statements on the tape overwhelmingly constituted Michael Marcello's recounting of information provided to him by John Matassa (who was associated with the Outfit), which in itself would be hearsay. The layers went deeper, however, because Matassa was recounting information that he had

received from yet another person—Guide, under the government's theory—as to what the source had learned. With so many layers of retelling, the reliability of the information is certainly suspect, and was properly excluded as hearsay by the court. The court allowed only the use for non-hearsay purposes and Ambrose has failed to demonstrate how that was erroneous.

Ambrose argues that the government nevertheless introduced the evidence at trial for the truth of the matter, and refused his efforts to introduce other testimony to refute it. First, Ambrose asserts that the statements were "pure hearsay" that did not fall within any exception to the hearsay rule. As support for that, Ambrose points to the court's rejection of the government's *Santiago* proffer, which would have allowed the introduction of the statements as non-hearsay. Ambrose argues that because that argument was rejected, it "naturally and logically followed that the statements in fact constituted hearsay," and that no hearsay exception applied. Ambrose further asserts that any use of the statements violates the Confrontation Clause because he did not have the opportunity to cross-examine Matassa and Guide, who were the source of the information.

There is no basis for concluding that because one exception to the hearsay rule does not apply, that a statement constitutes hearsay for all purposes and cannot meet any other exception. The court's determination that the Marcellos were not coconspirators with Ambrose does not foreclose any possible use of the state-

ments. The court in this case allowed only non-hearsay use of the statements—use for something other than the truth of the matter. That ruling was a significant blow to the government, which desired to use the Marcello conversations as a roadmap pointing to Ambrose as the source of the information regarding Calabrese's cooperation. Used for the truth, those statements would have identified the "source" as someone who was a "babysitter" for Calabrese, who had access to notes on him, and whose father had served time in prison with Guide and DeRango after a conviction in the Marquette Ten case and had died. That would have pointed directly to Ambrose. The court limited the government's use to matters unrelated to the truth of the matter. The only uses allowed, then, were for non-hearsay purposes, which does not in any way conflict with the ruling on the *Santiago* proffer.

One problem, however, is that the government veered from that proper use on a number of occasions during the trial. In opening arguments, the government declared:

> And the identity of the person who leaked the information to the mob . . . that made its way to the mob became pretty clear.
>
> The Marcello brothers identify the source of the information as being close to a man named Guide, William Guide. They talk about the fact that Guide spent prison time with Mr. Ambrose's father. Both Mr. Guide and Mr. Ambrose's father were police officers. They were both convicted together in a federal case prosecuted by the U.S. Attorney's office,

by the FBI. And Mr. Ambrose's father passed away while in prison. Mr. Guide came home, as they say, came out of prison, and took Mr. Ambrose under his wing. And that case in which Mr. Ambrose's father and Mr. Guide was convicted was the Marquette 10 prosecution.

And the men, the Marcello brothers refer to, their source, as the kid and the baby-sitter. So. Make no mistake. The Marcello brothers do not know the name of the defendant, but they know all these other details that only point to one person.

Tr. at 928. Defense counsel did not object at the time, but later referenced the statements as improper. The government subsequently elicited the same information in the testimony of Agent Michael Maseth, who is an FBI agent who worked on the Family Secrets case and with Nick Calabrese. Maseth testified as to the Marcellos' conversation, including the statements that would point to Ambrose as the source if taken for the truth. When the government revisited those statements during Michael Marcello's testimony, the court decided that the taped statements should be excluded because their relevance was for the truth of the matter rather than as evidence of a leak. The court instructed the jury to disregard those statements. Finally, the government again made an offhand reference in closing argument, referring to Ambrose as Calabrese's babysitter, a reference that could only be understood as a reference back to the Marcello statements, and which again dances over the line into using those statements for the truth of the matter. At

best, the government's frequent efforts to step over the line drawn by the court evinces a lack of care or the difficulty of discerning the contours of that line, and at worst a willful effort to avoid the impact of the court's decision against it.

Ambrose, however, failed to object to those efforts by the government to use the information for the truth of the matter. Although Ambrose at times referenced his "standing objection" to the use of the testimony, that standing objection was to the court's determination that the statements could be used for non-hearsay purposes. But Ambrose had won the argument that the statements could not be used for the truth of the matter. When the government nevertheless attempted to offer the statements for that purpose, Ambrose should have objected that the use violated the court's prohibition on introducing it for the truth. Ambrose failed to do so, and his standing objection seeking to prohibit any use at all did nothing to alert the court that the evidence was objectionable for the distinct ground of violating the court's prohibition on use for the truth of the matter.

When a defendant fails to object to an evidentiary error, we review the matter only for plain error. *United States v. Wright*, 651 F.3d 764, 773 (7th Cir. 2011). Although Ambrose failed to object to the improper use of the statements, the court on its own repeatedly prevented the government from such improper use, and instructed the jury in detail on the limitations of its use of the evidence. The court frequently utilized examples to

ensure that the jury understood its limited use of the statements, as illustrated in the following exchange:

> Before we leave this clip, this would be a good example of a tape that is admitted as circumstantial evidence as opposed to proving facts asserted in the statements. Many of the statements made here are statements which the government will argue contain information that could only come from a source that has knowledge of the Calabrese revelations in protective custody.
>
> The defendant would argue otherwise, and I'm not taking sides. I'm just telling you the purpose of this evidence. For instance, here, at line 9 on page 1 Michael says "He was there for a week, a little over a week." Well, that isn't being offered to prove that he was there for a week or a little over a week, but the fact that Michael had that information, which he alleges he got from Matassa, is an indication that somebody knew that Calabrese was there for a little over a week. It doesn't make any difference whether he was or wasn't as far as this particular tape is concerned. You will find out otherwise whether he was there for a week.
>
> Then "they were driving him all over the city" at lines 12 and 13. That isn't offered to prove that they were driving him all over the city. . . .

Tr. At 682-83. In addition to so instructing the jury, the court acted on its own when the government overstepped the limits during Michael Marcello's testimony, and ordered the jury to disregard the statements. The

court also ordered that the transcript of those statements should be removed from the jury books. Again, Ambrose raised no objections to the court's handling of the matter. The court's response in the absence of any defense objection significantly ameliorated any adverse impact that the testimony could have had. Because the court in fact excluded the hearsay testimony that the government attempted to offer for the truth of the matter, Ambrose has failed to demonstrate a violation of the Confrontation Clause. *United States v. Gaytan*, 649 F.3d 573, 579 (7th Cir. 2011).

Even assuming that the statements improperly were admitted for the truth of the matter, however, Ambrose cannot demonstrate plain error. "Under that standard, we determine whether there was (1) an error, (2) that was plain, (3) that affected the defendant's substantial rights, and (4) that seriously affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Baker*, 655 F.3d 677, 681 (7th Cir. 2011). In fact, this claim could not survive even the lesser harmless error standard. We focus only on the offenses of conviction. On Count 1, the jury found that Ambrose had stolen, converted, or conveyed without authorization the following information: Ambrose worked on and was assigned to Nick Calabrese's WITSEC security details. On Count 2, the jury found Ambrose guilty of unauthorized disclosure of the following information: Nick Calabrese was brought to Chicago as part of the WITSEC program; Ambrose worked on and was assigned to Nick Calabrese's WITSEC security detail. The statements, if used by the jury for the truth of the

matter, would have identified Ambrose as the person who had worked on the WITSEC security detail and revealed information regarding Nick Calabrese's presence in Chicago. As the court noted, however, the evidence at trial was overwhelming that Ambrose had revealed the information, and he had admitted as much on three separate occasions. In each of the three separate interviews, he acknowledged that he had told Guide that he was working the security detail protecting an organized crime figure, and in at least some of those statements he acknowledged providing information that Nick Calabrese was that person and was in Chicago. Those were the only facts upon which the jury rendered a guilty verdict. The jury did not find Ambrose guilty of a list of other facts that he was accused of revealing. Therefore, any error was not plain, and in fact even under the lesser harmless-error standard it was harmless.

Ambrose's remaining evidentiary challenge is to the district court's exclusion of statements by the Marcellos that referenced a U.S. Attorney in discussing the source of the leak. In the taped conversation, the Marcellos, in discussing the source of their information, recited a last name and referred to that person as a U.S. attorney and then referenced "Notre Dame." The defense attorney sought to admit the statements as evidence that some-one who knew that U.S. attorney could have been the source, though specifically disavowed any inference that the named U.S. attorney was involved in wrong-doing. That use raises the same problems as the use of the Marcello statements by the government. The con-versation in which Michael Marcello refers to the U.S.

Attorney once again appears to be a discussion by Marcello of information given to him by another person. The court conducted a voir dire to determine whether to admit the statements, and in that questioning Marcello—who had been granted immunity and compelled to testify—denied any knowledge regarding the U.S. Attorney. Defense counsel even elicited from Marcello that he had no personal knowledge as to the identity of the source and that all of his information was provided to him by Matassa. The absence of personal knowledge by Marcello, and the admission that all of the information in the conversation was relayed to him by Matassa, renders the statements hearsay. Because Ambrose has not identified any exception to the hearsay rules that would allow admission, the court properly excluded the statements.

Ambrose argues only generally that the "rule of completeness" requires that we allow the admission of those statements. Pursuant to Federal Rules of Evidence 106, "when a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it" and that principle extends to unrecorded statements under the "rule of completeness." *United States v. Muoghalu*, 662 F.3d 908, 913 (7th Cir. 2011). The rule of completeness holds that a complete statement must be read or heard when "it is necessary to (1) explain the admitted portions, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure

a fair and impartial understanding." *United States v. Yarrington*, 640 F.3d 772, 780 (7th Cir. 2011). Ambrose has failed to explain how introduction of the hearsay regarding this potential source of the leak is necessary. In fact, Ambrose fails to even identify the factors that apply in analyzing a rule of completeness claim. Ambrose merely points to the statements as necessary to counter the statements by the Marcellos that would identify Ambrose as the source, but the court refused to allow those statements into evidence for that purpose. His entire argument seems to be premised on the notion that the court allowed the Marcello statements for the truth of the matter against him, but that is without any basis. Even in the absence of objections by defense counsel, the court on its own repeatedly acted to ensure that the statements were not used by the jury for that purpose. Accordingly, Ambrose has failed to demonstrate that the hearsay statements must be allowed under the rule of completeness.

V.

Ambrose raises a few other issues that merit only brief discussion. First, he complains that the court erred in its handling of a note from a juror and in responding with a four-page supplemental instruction. The juror note included six typed questions followed by one handwritten one, and the district court responded to each of them. Ambrose first asserts that the court should not have responded at all because the typed portion was prepared by a single juror at home and therefore did

not come from the jury. The note, however, was not submitted until after jury deliberation had begun, contained a handwritten question after the typed ones, and was signed by the jury foreman. All of those factors indicate it came from the jury and the court acted within its discretion in choosing to respond.

Ambrose further complains that the court's response was too closely tied to contested facts, such that it amounted to a comment by the court on the evidence. Ambrose argues that the court, in discussing the terms "stolen" or "stealing," should have instructed the jury in a manner consistent with the Supreme Court's handling of those terms in *United States v. Turley*, 352 U.S. 407 (1957). Moreover, Ambrose contends that the court in its response conflated criminal liability of both Counts 1 and 2, allowing the fact of disclosure alone to cause the jury to find criminal liability. He also asserts summarily that the court's response allowed the jury to convict on grounds of negligence, and failed to address the burden of proof and unanimity requirements. These arguments are conclusory and undeveloped. Ambrose fails to identify any specific language in that four-page response that is inconsistent with the law as set forth in *Turley* or elsewhere, or which invades the province of the jury, nor is any apparent. The instructions as a whole adequately set forth the burden of proof and unanimity requirements, and therefore this argument fails as well.

Finally, Ambrose challenges the court's imposition of a sentence above the Sentencing Guidelines range. The

Guidelines advisory range for the offenses of conviction was 12-18 months. The district court deviated from that range based on its application of the factors set forth in 18 U.S.C. § 3553(a), imposing a sentence of four years' imprisonment and three years' supervised release on each count to be served concurrently. Ambrose claims that the court erred in applying those § 3553(a) factors by finding facts that were not based on reliable evidence and by giving insufficient weight to factors favoring a lighter sentence. Section 3553(a) requires the sentencing court to consider myriad factors in imposing a sentence, including: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with needed training or care; the kinds of sentences available; the Guidelines range and policy statements by the Sentencing Commission; the need to avoid unwarranted sentence disparities among similar defendants; and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a). "[A]lthough the 'Guidelines should be the starting point and the initial benchmark,' district courts may impose sentences within statutory limits based on appropriate consideration of all of the factors listed in § 3553(a), subject to appellate review for 'reasonableness.'" *Pepper v. United States*, ___ U.S. ___, 131 S. Ct. 1229, 1241 (2011), quoting *Gall v. United States*, 552 U.S. 38, 49-51 (2007).

Ambrose takes issue primarily with the district court's analysis of the first § 3553(a) factor which examines the nature and circumstances of the offense and the history and characteristics of the defendant. The district court disagreed with the defendant's characterization of his criminal conduct as merely foolish bragging to Guide. The court noted that Ambrose had provided a different explanation for his conduct to Fitzgerald and Grant at one point in the interview, indicating that he had revealed the information in order to curry favor with the mob so that he could enlist the help of mob figures in the future to locate and arrest wanted fugitives such as Joey Lombardo. The court also noted that Ambrose's depiction of his conduct was inconsistent with the facts; a foolish moment of indiscretion would not account for the considerable amount of information that was revealed, nor that it was disclosed on more than one occasion. In convicting Ambrose on Counts 1 and 2, the jury found him guilty only of two disclosures: that Nick Calabrese was brought to Chicago as part of the WITSEC program, and that Ambrose worked on and was assigned to Nick Calabrese's WITSEC security detail. The court, however, found by clear and convincing evidence that Ambrose obtained and disclosed the other information in the counts, which included information that Calabrese was talking to the federal authorities about murders of which Calabrese had knowledge such as the Spilotro murders.

Ambrose argues that the district court concluded—without any support in the record—that Ambrose's conduct was not foolish bragging but

rather was an effort by Ambrose to assist Guide in building Guide's relationship with the mob. According to Ambrose, the "sole piece of evidence" that Guide had any kind of relationship with the mob was that he served prison time with John DiFronzo. That ignores other evidence linking Guide to the Outfit—particularly the evidence that the WITSEC information told to Guide found its way to the Marcellos, and Ambrose's own statements early on that he disclosed the information in an effort to curry favor with the mob. Those facts alone provide ample support for the district court's finding on this § 3553(a) factor.

The principal factor in the court's decision to impose a higher sentence, however, was not the nature and circumstances of the offense but the need to promote respect for the law and deter similar conduct. The court expressed its concern that this type of offense is very difficult to detect, and would have gone unnoticed but for the fortuitous taping of the Marcello brothers' conversations. Moreover, the crime itself is an extraordinarily serious one, which was supported by evidence that witnesses against the Outfit had been murdered in the past. There was also evidence presented that once the leak was revealed, federal witnesses refused to accept protection from U.S. Marshals in the Chicago area because of security concerns. Given the difficulty of detecting such leaks and the high stakes involved, the court did not err in concluding that the need to deter similar conduct required a more severe sentence than the Guidelines range.

Ambrose sets forth at length his positive character references and his strong family ties, but the court recognized that evidence and considered it. The court simply determined that given the nature of the offense and the need for deterrence, a higher sentence was warranted. We review all sentences under a deferential abuse of discretion standard, and hold that the sentence imposed by the district court was reasonable. *See Gall*, 552 U.S. at 41.

On a final note, we are sympathetic to Ambrose's request to the court that he should be allowed to serve his sentence at a facility close to his family, although that is not a decision for this court to make. Although his family is in the Chicago area and there are closer facilities such as the one in Oxford, Wisconsin, the Bureau of Prisons assigned him to the correctional institution at Seagoville, Texas. The distant location would be puzzling in any case, but is outright disturbing because that is the institution to which his father was assigned and it was on the track at that facility where his father died. The Bureau of Prisons has the discretion to place inmates as is necessary for its security needs, but we would certainly expect that such placement is not used to inflict punishment that was not ordered by the district court. We encourage the Bureau to reexamine the placement decision.

The men and women who serve our citizenry in the U.S. Marshals Service are deeply dedicated, intelligent and extraordinarily courageous public servants. It is no exaggeration to say that they are a bulwark of our democ-

racy. It is an honor and a privilege to serve as a U.S. Marshal. Thus, the actions of John T. Ambrose are beyond comprehension. His conviction and sentence are AFFIRMED.